McGAUGHEY'S
ADM'R
*vs.*
HENRY, &c.

| 15m 383 |
|100  220|

## McGaughey's Administrator *vs.* Henry, &c.

APPEAL FROM CHRISTIAN CIRCUIT.                    Case 41.

1. A testator dying after the Revised Statutes took effect, his property must be distributed according to its provisions, so far as undisposed of by will. Testamentary power is not impaired by these statutes.

2. A testator, after sundry devises of land to his children, says: "I will now designate the portion or tracts of land allotted and bequeathed to my beloved wife, J. P.," and describes two tracts, including his dwelling house and other buildings, making in all two hundred and fifty-five acres, "set apart for the exclusive benefit of my wife, to be disposed of in any way she may think proper, as life interest, and at her death or before to give said land to any one or more of her children as she may believe them most worthy or needy." The wife survived the husband but a short time, without making any disposition of the land. Held—that the wife took but a life estate in the land with power to give to her children according to her discretion, but failing to appoint, the land should be equally divided amongst the children taking under the will. (*Collins vs. Carlyle's heirs*, 7 B. Monroe, 14.)

3. A testator devised to his wife one third in value of his slaves, with power at or before her death to divide such slaves, as she might think proper, among her children. She failed to exercise the power of appointment. Held—that the children took equal interests in the slaves under the will as devisees. (See *Collins vs. Carlyle's heirs*, 7 B. Monroe, 14; *Brown vs. Biggs*, 4 Vez. 708; 6 Sim. 527; 12 Ib. 639.)

The facts of the case are stated in the opinion of the court.—*Rep.*

McGaughey's
Adm'r
vs.
Henry, &c.

*M. Mayes*, for appellants—

1. The only important question for the decision of this court is the construction to be given to the clauses in the will of Arthur McGaughey, in the disposition of the land and slaves to his wife.

For the appellant we contend that the Circuit Court placed an improper construction upon these clauses of the will, and that consequently injustice has been done to them by the judgment rendered.

It is manifestly certain that the testator did not intend to die intestate as to any part of his estate. That is obvious from the language employed. And the language used by the testator in the devise of the two hundred and fifty-five acres of land to his wife, is such as to show an intention on his part, to convey said land to her in fee simple, and not for life. He gives said land to her for her exclusive benefit, to be disposed of in any way she may think proper as life interest, and at her death, or before, to give said land to any one or more of her children as she may believe them most worthy—thereby vesting her with the absolute power over the land, to dispose of it as she might think proper, either at her death or before, to any one or more of her children. She having failed to dispose of the land, it descended to her children, her heirs-at-law.

2. He in like manner gave to his wife, J. P., by his will, one third part in value of his slaves, and says : "at or before the death of my widow she is privileged to divide said slaves as she may think proper among her children," using the same language, in substance, that was used in regard to the disposition of the land, having by other provisions of his will disposed of all the property owned by him, except that devised to his wife. But if mistaken as to the character of the estate acquired by Mrs. McGaughey under the will of her husband, and she only acquired a life estate, with a limited power to dispose thereof, either before or at her death, and she having died without exercising that power, still it is contended that the land

and slaves passed by the will, and should not be taken into hotchpot with the advancements made to the devisees of the testator.   It is evident that it was not the intention of the testator to make his sons and daughters equal, but that he intended that the property devised to his wife should be by her disposed of, as to her might seem right; and if she failed to make any disposition thereof, then that property, and that alone, should be divided equally between his devisees; and in making that division, no notice should be taken of advancements made, and legacies given by him to the devisees.   Mrs. McGaughey having died without disposing of said land or slaves, the chancellor, in carrying out the intention of the testator, should distribute among the devisees equally, not the entire estate of the testator, but the land and slaves devised by him to his widow, Julia P.

3. If it be held that only a life estate was devised to the widow, with power to dispose thereof in a limited way, she having died without executing the trust, then the chancellor will execute the trust; and in doing so will limit his action to that property devised to her.

4. The decree as to the two negroes each to Robt. and John McGaughey, was evidently in accordance with the intention of the testator, as expressed in his will, when he directs out of the remaining two-thirds of the slave property, his widow, if she thinks proper to do so, shall set apart two negroes to each of his sons Robert and John, to equal the value of the two negroes he gave to his daughters, &c.; "after this is done," &c., showing clearly that it was his will that it should be done; and until done no division of the remaining slaves could take place.

5. In the construction of wills, some effect should be given to every clause, and every word if possible, and the intention of the testator is the cardinal rule which governs; and it would be repugnant to the general tenor and object of the will so as to make the testator die intestate as to the land and slaves

devised to Mrs. McGaughey, after the expiration of her estate therein. This will was made in 1850. The law in force at the will should govern. And if it should be held that the land and slaves devised to Mrs. McGaughey, after her death, did not pass by said will, but that as to the remainder the testator died intestate, then, under the law in force at the time of the making of the will, that property should be equally divided between the testator's heirs-at-law, without any reference to advancements or legacies given them by the testator. Wherefore said judgment should be reversed.

*Robert McKee*, on the same side—

1. This controversy grows out of the construction of the will of Arthur McGaughey. On the one hand it is contended that the powers delegated to Mrs. McGaughey were naked powers, and have lapsed by her failure to exercise them, and that consequently Arthur McGaughey died intestate as to the reversionary interest in the land and slaves devised to Mrs. McGaughey, and also as to four slaves which she was authorized to set apart for Robert and John McGaughey. On the other hand it is contended that there is an implied gift of the slaves and land to defined and certain objects, in such manner as to raise a trust for those objects, which a court of equity will execute notwithstanding the death of the donee of the power.

2. In determining all questions arising upon the construction of wills, "we must look to the intention of the testator upon the whole instrument, giving effect to every clause and word, and allowing no inconsistencies or contradictions, if it can possibly be avoided." The will of the testator, examined with an eye to these canons of construction, manifests on the part of the testator an intention not to die intestate as to any part of his property specified in his will, but to direct what should be done with it in that that was left undone by himself, and courts will not

make a constructive intestacy against the intention of the testator. It is also manifested by the testator that his children, as a class, should ultimately and at all events have the land and slaves, devised to his wife, Mrs. Julia P. McGaughey. She might, under the power delegated, have given the land to one child, and have excluded all the others. As to it she had a power of election and exclusion among her children only. As to the slaves she was authorized to divide them amongst the children as she thought proper. She could not however exclude any child from a substantial share in the slaves. It is most manifest that the objects of the testator's bounty were his children. The property which they were to receive was fixed and certain. It was beyond the absolute power of disposition of the donee of the power of any other; and courts of equity, under such circumstances, hold the power a trust for the specified objects, and will execute the power in behalf of those objects, notwithstanding the failure of the donee to do so. (*Brown vs. Biggs*, 4 *Vez.* 708; same case in 5 *Vez.* 495; *Kempe vs. Kempe*, 8 *Vez. Jr.* 849; 2 *Story's Eq.* sec. 1068, *et seq;* 1 *Jarman on Wills*, 485, *et seq.*)

There is, however, this difference between the execution of a power by a donee and by a court of equity. The courts of equity have not and will not exercise a discretion of selecting among the objects or make any other than an equal distribution of the trust fund. It is true that where a power of appointment has been exercised by the donee making an unequal distribution amongst the objects of the power, and it is complained that the appointment is illusory, the court will look into the advancements made to the complaining party *by the donee* of the power; but in no other case and under no other circumstances is the testimony of the circumstances, condition, and estate of the parties relevant or proper; for when it is determined that there is an unexecuted trust, the court under all circumstances executes it by an equal

distribution among the objects of the testator's boun-
ty. (5 *Vez.* 849, *Kempe vs. Kempe;* 7 *Vez. Jr.* 124,
*Longmore vs. Brown;* 9 *Vez. Jr. Cumings vs. Coleman;*
2 *Sug. on Pow.* 225.)

Certainly it would not have been competent to
have proved that one of the plaintiff's labored under
a personal defect, and it was the positive and une-
quivocal direction of the testator to the donee of the
power to give the whole land to that child, and that
this was the reason for the difference in the language
as to the land and slaves.

It is said by appellees that there is no trust raised
for the benefit of Robert and John as to the two ne-
groes each, authorized to be set apart for them by
Mrs. McGaughey. There is also a power given to
the two sons "to take those two negroes of male or
female." This power to the sons is not dependent
on the power delegated to their mother.

The whole clause on that subject shows that the
testator intended to make his children equal, or near-
ly so, in negro property. The Circuit Court, differ-
ing with this view of the case, erred, as is believed.
Wherefore a reversal is claimed.

*R. L. Petree,* for R. G. Henry and children—

1. The first question we will notice is the right
claimed by Robert and John McGaughey to have two
slaves each set apart to them before a general divi-
sion of the slave property.

The presumption is that the testator understood the
inequality in value of the real estate devised to his
children. That the value of the lots given to his
sons were greater than the lots given to his daugh-
ters. He also knew that under the will his daughters
would get no part of the personal estate; and know-
ing that he had made this inequality in favor of the
sons, he gave to his wife the power, if she thinks
proper to do so, to make the sons equal with the
daughters in slave property. It was a mere naked
power conferred upon the wife, which she never exe-

cuted, nor attempted to execute, and we think a court of chancery will not attempt to execute a power which was left entirely in the discretion of the widow, who had the same motives to do justice among the children that the testator had.

In the devise of the land he left a portion to his widow with discretionary power to dispose of it among her children as they might be most worthy or needy—showing that he had full confidence that she would make a judicious disposition of it amongst her children. The power conferred is wholly a discretionary power, and not even directory. We construe the language as merely conferring a naked power, and not raising any trust for the benefit of the sons which a court of equity can execute. In the case of *Hawkins vs. Hawkins*, 13 *B. Mon.* 245, it seems a power of emancipation was conferred upon Lucy Hawkins by the will of her husband, coupled with an expressed *desire* and *wish* that she would emancipate the slaves devised to her, when they should arrive at the age of thirty-one years. This court held the language to be only *advisory* and not *mandatory* or imperative, which was considered necessary to create a trust in favor of the negroes which could be executed by the chancellor.

There is nothing in the language of the will of Arthur McGaughey which is *mandatory* or *imperative*, and being a merely naked power unexecuted, this court cannot undertake to say what the discretion of the widow would have been had she lived. To create a trust the language must be imperative and mandatory. The following are referred to as authorities sustaining this point. (1 *Story's Eq.* 105; 2 *Ib.* 1069; *Bull vs. Vardy*, 1 *Vez.* 270.)

If this construction of the will be correct, then the testator died intestate as to the four slaves which the widow had the discretion to set apart for the sons; and as there is an inequality in the portions of the children, which is admitted by the pleadings, that part of the undevised portion of the estate must be

applied to make the heirs equal, taking into consideration all the advancements and devises. (*Revised Statutes*, 282.)

2. The decree of the court below is based upon the opinion that no part of the estate is undevised. That portion of the land devised to the widow for life, and to be disposed of at or before her death among any one or more of her children, as they were most worthy or needy, and the slaves that were devised to her for life, with power to dispose of them among her children, was construed to raise a trust in favor of all the children. A question arises under the devise of land and slaves to the widow for life, whether a trust is created in favor of all the children; and if so whether a court of chancery, where there is an inequality, has the power to take into consideration that inequality, in the division of the estate held for life. The Circuit Court was of opinion that it had that right, and was not bound to make an equal division among the children without regard to what they had formerly received under the will.

There can be no doubt but that the widow had the right to make an unequal division of the property among her children; and such an execution of the power would have been valid, but a court of equity standing in *loco parentes* will execute the power so as to make them equal, taking into consideration the whole estate devised.

The appellant in the Circuit Court referred to the case of *Kempe vs. Kempe*, 5 *Vez.* 580. The court in that case decided that an illusory appointment would be set aside, but recognised the right to make an unequal division of the property, when the circumstances made it equitable to do so; and if the donee of the power had a right to so take into consideration all the facts connected with the devise, we see no reason why a court of equity might not do so. The appellees only seek to be made equal with the two sons, taking all devises and advancements into consideration.

*Morehead & Brown*, for appellees—

The will and the question of distribution must be governed by the law as it stands in the *Rev. Stat.* page 282.

It is clearly shown by the record that the advancements were very unequal, and that the shares received by the two sons, were much greater than the shares received by the daughters.

Upon the bill filed to distribute the estate, the Circuit Court, after giving the sons of the testator the two additional slaves, brought it into hotchpot, and made an equal division. The correctness of this decision depends upon the proper construction of the will, and the power of the chancellor.

1. The testator did not empower his widow to make the division "among all his children," but "to any one or more of her children"—a very important difference in language, as clearly and accurately shown by Sir R. Arden in the leading case of *Kempe vs. Kempe*, 5 *Vez. Jr.* 856 to 862, on the subject of illusory appointments.

In this case, if the widow had made an appointment of all to one of the children, it would not have been an illusory appointment; and it is only in *vacating illusory* appointments that the chancellor refrains from making a discretionary division. If, therefore, there is no implied trust, the chancellor will divide this portion of the estate, either upon equitable principles, looking to the whole estate, or, which will produce the same result, under our present statue of distributions.

Story, in his *Equity Pleading*, page 415, *vol.* 2, *sec.* 1069, after a review of all the authorities, clearly shows that this is a naked power, and wholly unconnected with a trust. Not one of the expressions or their equivalents, which have ever been held to create a trust, are used. The only apparent confusion arises from the fact those persons, amongst whom the appointment might have been made, were his children, the wife having but a life estate, and

the power of appointment. Suppose the power had been to divide it among one and all of his (testator's) brothers and sisters, could it for a moment be contended, that there was a trust which the chancellor would execute? And would there not be an intestacy as to this property, in case the wife failed to execute the power? Surely there would. It results in the same manner in the present case. His intestacy as to this property depended upon the single question, whether the widow did or not exercise the power? The testator may have thought—he may have hoped—that she would exercise the power, but he did not even request it; and the position that he intended to create a trust in case of her failure, is wholly unauthorized.

2. In regard to the one-third of the slaves, the language is peculiarly clear. She is simply *privileged* to divide or give. No trust is created—he makes no remainder over, and we cannot conceive any plausible argument, which would tend to show that there is not an intestacy as to the remainder in these slaves.

January 23.

Chief Justice MARSHALL delivered the opinion of the Court—

Arthur McGaughey died, possessed of a large real [Judge Stites and personal estate, after having made his will, did not sit in which was proved and admitted to record in the this case.] County Court of Christian county, in October, 1852. His widow, a principal devisee, died about five days after the death of the testator, and Mrs. Harriet Henry, one of his daughters, and also a devisee, survived them but a few days. No executor having been named in the will, Eddin Morris was appointed administrator, &c., and the widow, having died intestate, Robert McGaughey, one of the testator's sons, was appointed her administrator. This petition was filed in January, 1853, by Eddin Morris, administrator, &c., and Robert McGaughey as administrator, and in his own right, and Altius Wallace, and Helen, his wife, a daughter of the testator, and John W. Mc-

Gaughey, an infant son of said testator, suing by his guardian and next friend against Arthur M. Henry and Harriet G. Henry, infant children of Harriet Henry, deceased, and R. G. Henry, their father and guardian, to have a division of the testator's slaves according to a division previously made, by commissioners appointed by the Christian County Court, but disapproved and rejected by that court, or according to such principles as might be conformable to equity and the directions of the will.

The defendants, the children and husband of the testator's daughter, Harriet Henry, objected to the division already made, as doing them injustice, and showing that the portion of the testator's estate which his daughter, Harriet Henry, had received, by way of advancement, and under the will, was less than that received by and devised to another of the testator's sons or his other daughter. They prayed that the estate yet to be divided might be so apportioned as to give to those entitled to the share of said Harriet, one-fourth of the entire estate, and thus produce equality among the four children of the testator, considering the two children of Mrs. Henry as standing in the place of their mother.

The principle on which this claim is founded, is established with respect to the undevised estate of a deceased ancestor, by the 17th section of the 30th chapter of the Revised Statutes, page 282. And this testator having died after the 1st day of July, 1852, when the Revised Statutes took effect, his estate, so far as it is undevised by his will, is subject to the provision referred to; which requires that the undevised estate shall be so disposed of as to produce as near as may be, an equality in the distribution of the whole estate, real and personal, devised and undevised. But as the statute leaves the testamentary power unimpared, and disposes and directs the disposition of that part only of testator's estate of which he has not himself disposed, it is necessary before the statutory provision for equality can be

1. A testator dying after the Revised Statutes took effect, his property must be distributed according to its provisions, so far as undisposed of by will. Testamentary power is not impaired by these statutes.

applied in this case, to ascertain what portion of the testator's property, if any is left undisposed of by his will.

It appears that some short time before the execution of the will, which bears date in August, 1850, the testator, with a view to the disposition of his estate by will, had caused his tract of land, consisting of upwards of thirteen hundred acres, to be laid off into lots numbered 1, 2, 3, and 4, leaving still a residuum of about two hundred and fifty-five acres. To his daughter Harriet Henry he devised lot No. 1, containing two hundred and forty-five acres; to his daughter Ellen Wallace, No. 2, containing in two parcels, two hundred and forty-two acres, to his son Robert, No. 3, containing, also in two parcels, three hundred and five and a half acres, and to his son John M., No. 4, estimated to contain three hundred and nine acres. After these devises, which contain additional description besides the numbers of the lots, the will proceeds as follows: "I will now designate the portions or tracts of land allotted and bequeathed to my beloved wife, Julia P.," and describes two tracts, including his dwelling house and other buildings, and making altogether two hundred and fifty-five acres, "set apart for the exclusive benefit of my wife, to be disposed of in any way she may think proper as life interest, and at her death, or before, to give said lands to any one or more of her children, as she may believe them most worthy or needy." And no further disposition is made of the lands here spoken of. "As to my negro property, (the will proceeds,) my daughter Harriet got two likely young women, to-wit, &c. My daughter Ellen, as her sister, at her marriage got two likely negro women. My wife and son Robert are requested to call in three or five discreet men, my wish is Eddin Morris, (and three others named,) or any three of them, and be them men those whom they may; are to ascertain the value of my slave property, and then my widow shall have

her choice of the negroes to equal one-third the total value, and at or before the death of my widow, she is privileged to divide said slaves as she may think proper, among her children. Out of the remaining two-thirds of slave property, my widow, if she thinks proper to do so, set apart two negroes to each of my sons Robert and John William, to equal the value of the negroes I gave to their sisters E. Wallace and H. Henry, my sons having their choice to take those two negroes male or female. After this is done, the above named men, if to be had, if not, others of like character, will proceed to divide the remaining negro property equally among my children, to have and to hold, &c."

The will then states that this division of negro property cannot be made until the end of the year, 1853, when a partnership between the testator and his son Robert will cease, which partnership the widow is authorized to settle as she may think proper, &c. The will then proceeds : "And further, as it relates to my household and kitchen furniture, carriage, wagon, farming utensils, stock of every kind on the farm, is to be divided between my widow and her two sons, to set up business for themselves separately, if they think proper so to do, first selling as much stock as will pay what debts or money I owe. My daughters are to have their piano, or its proceeds, equally between them, when their mother wishes them to take it away."

Shortly after the death of the testator and his widow, the entire personal estate, including that bequeathed to his widow and sons, and also the piano, (but not the slaves,) was sold by his administrator, by agreement between the two administrators and others concerned, the proceeds to be divided among the parties entitled under the will, subject, of course, to payment of debts, of which, however, there seem to be none, and certainly none of any consequence. The entire proceeds were upwards of $4,000.

With regard to these proceeds there can be no difficulty. Those arising from the sale of the piano are to be equally divided between Mrs. Wallace and the representatives of Mrs. Henry, the husband in both instances being entitled. Of so much of the residue as arose from the property bequeathed to the widow and the two sons, after such deduction as may be proper for debts and expenses, one-third of the remainder belongs to each of the sons, and the other third to the administrator of the widow, to be distributed according to law, among her heirs; and if there be anything more, it is undevised estate of the testator, to be so disposed of as to equalize, as far as it will go, the portions received by the testator's children or their representatives, either by way of advancement or under the provisions of his will. But in making this distribution, with a view to equality, the slave given by the testator to his daughter Mrs. Henry, after the execution of the will, to compensate for the difference in value between the land intended for, and devised to her, and that devised to her sister, Mrs. Wallace, is to be taken into the estimate.

With regard to the two slaves which the widow, if she thought proper, was to set apart to each of the two sons, we think it entirely clear, that the testator intended that the slaves should be allotted to them, whether the widow chose to act in the matter or not. For not only is the cause or consideration of the gift of the two slaves to each of them recited, viz: That two had been given to each of their sisters, but they are to choose whether they will take males or females, and it is only after this allotment is made that the residue of the slaves, not chosen by the widow for her third part, are to be divided. And as this division is certainly to be made, so must the previous allotment to the sons be made, though the widow's co-operation should be withheld, or become impossible. She had a mere privilege to act in a matter which was to be done at all events, and

her failure to act, from whatever cause, did not affect the right in the ascertainment or satisfaction of which she had a privilege to co-operate.

The principal question, however, and that which presents the chief difficulty in the case, grows out of the devises of the land and slaves to the widow, and the power or privilege thereto annexed. There is not, in either devise, an express grant of the fee simple or absolute interest, nor is there any express limitation for life. But, although on the face of the will some considerations present themselves in favor of the alternative, that a fee simple was intended with a restricted power of disposition, we are inclined to the opinion, upon the whole will, that it was intended that she should have but an estate for life, and that intention, collected from the whole instrument, is sufficient to restrict the indefinite terms of the gift. The power to give the land to one or more of the children, as she might believe them most worthy or needy, was probably intended for the purpose, in part, of enabling her to meet the possible expenses of the family, and principally as a means of securing to her the respectful and affectionate attention of the children. Being a power to give to one or more, their could have been no legal ground of complaint, if she had executed the power by giving all to one child, or by giving to all in greatly unequal portions.

The power of dividing the slaves when and as she should think proper, was probably give for the same purposes, and intended to be of the same nature. But as there is no express power of selection or exclusion, the authorities seem to require that in the execution of the power by the donee, there should be an actual division among all, so that each should receive a substantial, though not necessarily an equal share. (*Kempe vs. Kempe*, 5 *Vezey*.) In this case, however, as there was no attempt to execute the power in regard either to land or slaves, no question arises upon that subject, and no question as to an illusory appointment or execution of the power. Nor does the dif-

McGAUGHEY's
ADM'R
*vs.*
HENRY, &c.

2. The testator, after sundry devises of land to his children, says: "I will now designate the portion or tracts of land allotted and bequeathed to my beloved wife, J. P." and describes two tracts, including his dwelling house and other buildings, making in all 255 acres, "set apart for the exclusive benefit of my wife, to be disposed of in any way she may think proper, as life interest, and at her death or before to give said land to any one or more of her children as she may believe them most worthy or needy." The wife survived the husband but a short time, without making any disposition of the land. Held— that the wife took but a life estate in the land with power to give to her children according to her discretion, but failing to appoint, the land should be equally divided amongst the children taking under the will. (*Collins vs. Carlyle's heirs, 7 B. Monroe, 14.*)

ference which has been noticed in the terms of the two powers lead to any difference in the principle or mode of distribution to be adopted by the chancellor, if both land and slaves are to be divided or distributed under the will. It seems formerly to have been held that the chancellor might take the place of the donee of the power when his execution of it had become impossible, and exercise his right of selection and discrimination, and upon the same grounds. In the modern cases, however, it is considered that such discretion belongs to the donee of the power alone; and the chancellor, if he recognizes the right at all, recognizes it as belonging to the class from which the selection or discrimination is to be made, and divides among them equally, *per capita*.

We come, then, to the inquiry to which our attention has been chiefly called by the argument, and by the interest of the parties, and that is, whether in the the event that has occurred, of the death of the widow without having executed the power and privilege given to her, and by which their literal and actual execution have become impossible, the will has made a disposition of the remaining interest in the land and slaves devised to her, or has left this interest undevised, and to be disposed of by the law. If the fee was given to the widow, with a restriction effectual or ineffectual upon her power of disposition, that would put an end to the question in the form in which it has been stated; and as the same persons would take these estates, and in the same proportions, whether they take by descent from the widow, or by the execution in equity of a trust implied in the restricted power, it would be unnecessary to inquire whether there was such an implied trust now enforceable in equity, or whether there was no such implied trust, and the power not having been executed, the land and slaves descended as the absolute property of the widow. In either case, the land and the slaves would be divided without regard to what may have been received by a gift or devise from the testator.

But if, as we have supposed, the widow took but a life estate under the devises of the land and slaves to her, then it becomes material to inquire whether there is anything in the will which, either directly or by way of trust, disposes of the remainder after her death. We think it can hardly be doubted that the testator intended to dispose, by his will, of all the estate which he should leave at his death. This might be presumed, and is expressly intimated in the introductory statement to the effect that his writing "to say how his legal representatives should, in carrying into effect his will in that that is left undone by himself." If he intended to give to his widow but a life estate, it cannot be supposed that he intentionally left so large a portion of his estate undisposed of, as the remainder in trust in the land and slaves devised to her. Intending, as we assume, to dispose of his whole estate, he had ample time and ability to take a deliberate view of the whole, to dispose of it in an intelligible manner, according to his wishes, and to consider whether, in writing his will himself, he had done so. If he overlooked anything, it was not the large interest now in question. He undoubtedly supposed and intended that by the exercise of the power given to his wife, and, through her agency, his children, or such as she might select, and in such portions as, in view of their conduct and condition, she might think proper, would and should receive this remainder interest. She had no discretion which might authorize her to take it from them, or to dispose of it to others, but only a power to select or discriminate among them. He obviously intended that they, or such of them as she might select, should have the property. Her untimely death, which prevented the exercise of the power, also removed the particular causes or reasons, on account of which it was invested in her. But the intention in favor of the children manifested by the gift of the power, did not depend upon its actual exercise, which might have been prevented by other causes than the daath of the donee,

McGAUGHEY's ADM'R vs. HENRY, &c.

3. A testator devised to his wife one third in value of his slaves, with power at or before her death to divide such slaves, as she might think proper, among her children. She failed to exercise the power of appointment. Held—that the children took equal interests in the slaves under the will as devisees. (See *Collins vs. Carlyle's heirs*, 7 B. *Monroe*, 14; *Brown vs. Biggs*, 4 *Vez.* 708; 6 *Sim.* 527; 12 *Ib.* 639.)

or might not, in her judgment, have been called for by the considerations to which it refers. And at last it was but an agency or instrumentality deemed suitable, under the circumstances, for effecting the transmission of this estate to his children; for he obviously had no others in contemplation in speaking of her children. Did he, then, intend that the failure of this agency should defeat entirely the object or end for which it was created? or is not the end still to be regarded, and, as far as practicable, accomplished, though the appointed means have failed?

There is some difference in the terms used in giving the power with respect to the land and the slaves. But the power, its objects and effects, and the discretion to exercise it or not, are substantially the same in each case, and in each case it establishes the inference that the testator intended that at the death of his widow, or sooner if she should think proper, the children, or (in case of the land) such of them as he might select, and as to both classes of property in such proportions as she might think proper, should take the property; and we think it is, in effect, a gift to them as a class, subject to her power of selection and discrimination. And that power having failed by her death, the gift to them as a class still remains.

For this conclusion, the case of Collins, &c.. vs. Carlisle's heirs, 7 B. Monroe, 14, seems to furnish a direct and authoritative precedent. And it is only because of the elaborate argument of the question in this case, and of the opposing opinion of the judge who decided it in the Circuit Court, that we have not been content to rest our conclusion upon the authority of the case just referred to. In that case the devise was in these words: "And the balance of my estate, wholly, I leave to my beloved wife, N. C., and to be disposed of by her, and divided among my children at her discretion." This court decided that upon the death of the wife, without having controlled or disposed of a certain part of the estate, (that is, without having exercised her power over it,) the children be-

came entitled to it, not as her heirs, but under the will of their father. And the opinion of the Circuit Court, that the wife took an estate for life under the will, was expressly approved and concurred in by this court. It is true, there was neither discussion nor citation of authority in support of the decision then rendered, which tends to prove that the court regarded the question as a plain one upon the will itself. And, although, upon such examination of authorities as we have had opportunity to make, we find that there is some discrepancy and, perhaps, confusion in the cases, we think the current of authority is in favor of the decision in the case above cited, and of the conclusion at which we have arrived, that the children take under the will.

In *Jarman on Wills, vol. 2, side page*, 485, the doctrine is laid down, that where property is given to one for life, and afterwards to such children, relations, &c., as he or she shall appoint, or among them in such proportions as the donee shall appoint, and there is no express gift to these objects, in default of appointment, such a gift will be implied; the presumption being that the donor did not intend that the objects of the power should be disappointed by the failure of the donee to exercise it in their favor. Among the cases referred to in support of this proposition, is that of *Brown vs. Biggs*, 4 *Vezey*, 708, where the bequest was, "to such children of my nephew S. as my nephew J. shall think most deserving, and that will make the best use of it, or (and) to the children of my nephew W., if any such there are or shall be." J. having died in the life of the testator, and he says, the Master of the Rolls, Sir R. P. Arden, and Lord Elden, held the children to be entitled under the implied trust. The same case is stated somewhat differently in *Hill on Trustees, side page*, 69; but as to the point now in question, the decision (by a different judge) appears to have been the same.

The author last referred to proceeds, in the page just cited, to say: "However, at the present day the

McGaughey's
Adm'r
vs.
Henry, &c.

courts will endeavor to construe a bequest of this de-scription, into a gift by implication to the objects of the power, in default of its being exercised ;" and he suggests that if the two cases before stated by him, in which the decision was different, were again to oc-cur, there is little doubt that the children would be held to take under the terms of the bequest, although the power were not exercised in their favor. And he refers to cases where the tenant for life is desired at his death to "give it among his children as he should think fit," (2 *Sugden on Powers*,) or where the residue, at the death of the tenant for life, is "to be disposed of amongst her children" as she should think proper, (*Kempe vs. Kempe*, 5 *Vezey*, 849,) or where there is a gift after the death of testator's wife, "to such of his grand-children" as she should appoint, and says there are many others in which the power has been held to extend only to a selection from, and distri-bution amongst the class of objects; and in default of the exercise of that power, they will be all equally entitled. For which many cases are referred to in the note. The cases of *Brown vs. Pocock*, 6 *Sim*. 527, and *Croft vs. Adam*, 12 *Sim*. 639, as stated in the text, confirm the principle advanced. These cases would bear most strongly upon the one before us, and in fa-vor of our conclusion, if the devise here were ex-pressly for the life of the widow , and we think they are little less conclusive upon the case of a life estate by construction ; and as already said, if she had the fee, it is immaterial, in the present case, whether the remainder passed under a trust, or simply by descent from her. The case of *Harrison vs. Harrison*, decided by the Supreme Court of Virginia, 2 *Gratt.* 1, and stated in *Hill on Trustees, page* 95, in a note, is, like the case of *Collins vs. Carlisle's heirs*, in this court, a direct authority for the present decision.

Judge Story, in his work on *Equity Jurisprudence*, treats of these trusts implied from powers, in section 1068, and those which follow. In the section named he states several strong cases in which trusts have

been implied.   But he does not make the distinction between cases in which the devise to the donee of the power is expressly for life, and those in which it is indefinite.   It is to cases in which a fee-in the first taker is expressly or impliedly given, that his observations with respect to a disinclination in modern times to extend the doctrine of recommendatory trusts are more particularly applicable.   And although we are inclined to think that even under the restrictions as stated by him, a trust would be implied in this case, though it should be held that the widow took more than an estate for life, we deem it unnecessary to push that inquiry, because, as already shown, it would be immaterial to the rights now in question, and because we have, upon grounds of reason and authority deemed satisfactory by us, placed the question in this case upon a different basis.   The result of our views is, that the lands and slaves, after the widow's death, passed, by the will, equally to the children of the testator, and must be now divided among them and their representatives, (the husband being entitled for life to the slaves, and probably to the lands belonging to the shares of their wives,) without reference to any inequality in other portions of the estate given or devised, but with a view to equality and proportion in respect to the lands and slaves which had been devised to the widow, who was entitled to one-third of the slaves, though she did not live to make choice according to her privilege.

Wherefore, the decree is reversed and the cause remanded for proceedings and decree in conformity with this opinion.