450 A.2d 162

UNITED STATES STEEL CORPORATION, Appellant,

v.

Mary Jo HOGE, Jessie Lee Cowan, Harvey C. Cowan and Mary L. Cunningham and Kinloch Development Corporation, Mary L. Cunningham, Harry A. Murdock, Jr., and Donis M. Murdock.

Superior Court of Pennsylvania.

Argued April 29, 1981.

Filed Aug. 27, 1982.

Petition for Allowance of Appeal Denied April 4, 1983.

184

Gilbert J. Helwig, Pittsburgh, for appellant.

R. Wallace Maxwell, Pittsburgh, for appellees.

Before CERCONE, President Judge, and BROSKY and HOFFMAN, JJ.

CERCONE, President Judge:

This is an appeal from the final decree of the Court of Common Pleas of Greene County[1] dissolving a preliminary injunction against certain drilling operations, quieting title in coalbed gas[2] contained in a certain coal seam in favor of the surface owners (which coalbed gas was the object of the temporarily enjoined drilling), and permitting the surface owners and their gas lessee to drill into the coal seam and to extract the gas contained therein, subject to certain restrictions imposed by the chancellor to prevent damage to the coal owner's interest in the coal.

We deal here with a question of first impression: the ownership of coalbed gas. Appellant, U.S. Steel, is the owner of the coal. The appellees are the surface owners of two tracts of land in Greene County, and their gas and oil lessee is Cunningham. The coal seam in question is known as the Pittsburgh or River seam and lies approximately 800 feet below the surface. The first surface tract is owned by appellees Mary Jo Hoge, Jessie Lee Cowan and Harvey C. Cowan; the second tract is owned by Harry A. Murdock, Jr. and Donis A. Murdock. (Hereinafter referred to jointly as surface owners or appellees). The appellees' predecessors in title relinquished their rights to the coal underlying the surface tracts by severance deeds to appellant's predecessor

1. The chancellor below was President Judge Glenn Toothman.

2. The gaseous substance subject of the instant appeal is known by several different names, among them: "coalbed gas," "coal gas," "methane gas," and "firedamp." Like natural gas, the primary component of this gas is methane, although it also contains ethane, propane, and lesser amounts of other gases. Its chemical composition is thus nearly if not entirely indistinguishable from natural gas. We will refer to the gaseous substance as coalbed gas.

in title in the early part of this century.[3] However, the surface owners reserved "the right to drill and operate through said coal for oil and gas without being held liable for any damages." Appellee Cunningham obtained an oil and gas lease to the Hoge-Cowan tract in December of 1976; and she obtained a similar lease to the Murdock tract in June of 1977.[4] The respective lessors granted Cunningham

3. The deeds in question read in pertinent part:
   "All the coal of the Pittsburgh or River Vein underlying all that certain tract of land situate in Whitely and Franklin Townships, Greene County, Pennsylvania, bounded and described as follows, to wit:  . . . .
   "*Together with all the rights and privileges necessary and useful in the mining and removing of said coal,* including the right of mining without leaving any support for the overlying strata and without liability for any injury which may result to the surface from the breaking of the strata or anything therein or thereon, *the right of ventilation and drainage and the access to the mines for men and materials;* the shafts or openings for such purposes, however, to be in the ravines or waste places upon said land and not any nearer then twenty rods of the principal buildings thereon; *also the right of mining, ventilating, draining and transporting the coal of other lands through the mines and openings in and upon the lands of the parties of the first part.*
   "*The parties of the first part hereby reserve the right to drill and operate through said coal for oil and gas without being held liable for any damages.*
   "Together with all and singular the improvements, ways waters, water courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever thereunto belonging, or in anywise appertaining, and the reversions and remainders, rent issues and profits thereof; and the estate, right, title, interest, property, claim and demand whatsoever of the said parties of the first part, in law, equity or otherwise, howsoever, of, in and to the same and every part thereof."
   (Emphasis ours.)

4. The oil and gas leases read in pertinent part:
   "Witnesseth, that the Lessor in consideration of the sum of One Dollar, the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained, *does hereby grant unto the lessee all of the oil and gas and all of the constituents of either in and under the land hereinafter described, together with the exclusive right to drill for, produce and market oil and gas and their constituents and of storing gas of any kind in any formation underlying the land,* and also the right to enter thereon at all times for the purpose of drilling and operating for oil, gas and water, laying pipelines, erecting tanks, machinery, powers and structures, and to possess, use and occupy so much of said

"all of the oil and gas and all of the constituents of either in and under" the surface tracts. In return, Cunningham promised to deliver to her respective lessors one-eighth "of all methane gas as well as . . . all gas and casing head gas produced and sold" under the respective leases.

U.S. Steel opened its Cumberland Mine in August of 1977 with the intention of eventually recovering coal in that portion of the Pittsburgh seam underlying both the Hoge-Cowan and Murdock tracts, which lay several miles distant from the mine's face. In January of 1978 Cunningham, the gas and oil lessee, began drilling a well on the Hoge-Cowan tract for the express purpose of recovering coalbed gas contained in the subjacent Pittsburgh coal seam. Cunningham drilled for the same purpose on the Murdock tract, beginning on March 31, 1978. Upon learning of the drilling operations and Cunningham's apparent intention to stimulate production of coalbed gas through a method known as hydrofracturing,[5] U.S. Steel initiated these consolidated actions in equity to terminate this instrusion and trespass upon · its coal seam property. It sought injunctive relief based on the alleged irreparable injury which would occur if hydrofracturing of the coal seam were performed, and further sought to preserve its right, title and ownership of the coal. U.S. Steel also sought a determination of the ownership and

premise, as is necessary and convenient for said purposes and to convey the above-named products therefrom or thereto by pipelines or otherwise, said land being. . . .
2.  . . .
3.  The lessee shall deliver to the credit of the Lessor free of cost, in the pipeline to which he may connect his wells, the equal one-eighth (⅛) part of all oil produced and saved from the leased premises, *and shall pay Lessor the equal one-eighth (⅛) part of all methane gas as well as for all gas and casing head gas produced and sold from the premise . . . ."*
(Emphasis ours.)

5.  Hydraulic fracturing or hydrofracturing is the use of fluids under pressure, which fluids are forced into the well hole causing the fracturing of the target stratum. With the hydrofracturing of coal beds the fractures in the coal vein serve as conduits or channels through which the gas may flow from the coal seam to the well's shaft.

right to develop the coalbed gas in the portion of the Pittsburgh seam beneath the two surface tracts.

The chancellor granted the preliminary injunction pending a disposition on the merits. Appellees filed preliminary objections which were subsequently denied. On March 24, 1980, after extensive testimony and argument, the chancellor entered his adjudication and decree nisi, permitting appellees to drill for coalbed gas contained in appellant's coal seam, but forbidding them from using any hydro-fracturing methods to obtain the gas. U.S. Steel filed timely exceptions. The chancellor denied the exceptions and filed an opinion and final decree in the matter on September 29, 1980.

On appeal, U.S. Steel questions the propriety both of the chancellor's conclusions of law and of the final decree.[6] Essentially U.S. Steel argues that the chancellor

---

**6.** U.S. Steel has also questioned several of the chancellor's findings of fact, contending that the evidence does not support those findings. The scope of our review in such matters is well settled. A chancellor's findings of fact will not be disturbed on appeal where there is adequate evidence in the record to support those findings. See *Estate of Shelly,* 484 Pa. 322, 399 A.2d 98 (1979); *Brentwater Homes, Inc. v. Weibley,* 471 Pa. 17, 369 A.2d 1172 (1977); *Gilmore v. Northeast Dodge Co., Inc.,* 278 Pa.Superior Ct. 209, 420 A.2d 504 (1980); *Kohr v. Kohr,* 271 Pa.Superior Ct. 321, 413 A.2d 687 (1979). Our task is to determine whether the record contains evidence which will support the chancellor's findings of fact, not to substitute our view of the evidence for his. See *Aiken Industries, Inc. v. Estate of Wilson,* 477 Pa. 34, 383 A.2d 808 (1978); *Gilmore v. Northeast Dodge Co., Inc., supra.* Even meager or uncorroborated evidence will support the chancellor's findings if the evidence is of record and properly before the court. *Cf. Farmers' Northern Market Co. v. Gallagher,* 392 Pa. 221, 139 A.2d 908 (1958); *Eldridge v. Melcher,* 226 Pa.Superior Ct. 381, 387, 313 A.2d 750 (1973). Thus, the chancellor's findings of fact are controlling on appeal unless it can be shown that they lack evidentiary support, or that the chancellor capriciously disbelieved the evidence, or that he abused his discretion in arriving at those findings. See *Silo Realty Corp. v. Redevelopment Authority of Philadelphia,* 289 Pa.Superior Ct. 67, 432 A.2d 1053 (1981); *Davis v. Buckham,* 280 Pa.Superior Ct. 106, 421 A.2d 427 (1980). We are not so bound as regards either inferences and conclusions reasoned from the facts, or the legal conclusions drawn therefrom; they are always subject to appellate review. See *Adler v. Montefiore Hospital Ass'n of Western Pennsylvania,* 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974); *McDole v.*

erred in concluding that the title to the coalbed gas or the right to recover it did not pass to the coal owners by the coal severance deeds in question. It puts forward four arguments based on the severance deeds, which would place the right to recover, or title to the coalbed gas in them and not in the surface owners. A fifth argument sounds the call of public policy. We will consider these arguments seriatim.

■ In our discussion of the coal severance deeds we are mindful of the applicable rules of construction. Those rules require that the instrument be construed to give effect to the intention of the parties to the instrument. See *In re Conveyance of Land Belonging to City of DuBois,* 461 Pa. 161, 335 A.2d 352 (1975); *Hardes v. Penn Charcoal & Chemical Co.,* 175 Pa.Superior Ct. 431, 107 A.2d 176 (1954). The rules of construction further require that a deed should be considered in its entirety, giving effect to all its terms and provisions, and reading the language in light of conditions existing at the time of its execution. *In re Conveyance of Land Belonging to City of DuBois, supra; St. Michael & Archangel Russ. O.G. Cath. Ch. v. Uhniat,* 451 Pa. 176, 301 A.2d 655 (1973). If the language of the deed prove ambiguous then it will be interpreted mostly strongly against the drafter of the deed. *New Charter Coal Co. v. McKee,* 411 Pa. 307, 191 A.2d 830 (1963); *Lacy v. Montgomery,* 181 Pa.Superior Ct. 640, 124 A.2d 492 (1956). However, this latter rule of construction may not be employed as some talismanic solution or magic formula for the construction of the ambiguous language or resolution of the dispute since, first and foremost, we must always keep an eye to the parties' intentions.

*Duquesne Brewing Co. of Pittsburgh,* 281 Pa.Superior Ct. 78, 421 A.2d 1155 (1980); *Philadelphia Fresh Food Terminal Corp. v. M. Levin & Co.,* 239 Pa.Superior Ct. 287, 361 A.2d 886 (1976). Where the evidence is contradictory, the chancellor's findings will be given greater weight, since he must necessarily pass on the credibility of the witnesses, even where most of the testimony is given by qualified experts. *Cf. In re Jones,* 432 Pa. 44, 246 A.2d 356 (1968). Our independent review of the record establishes that sufficient evidence was adduced at trial to support all the chancellor's findings of fact. The question merits no extensive discussion.

## 1.

U.S. Steel argues that its fee simple interest in the coal embraces everything in the geological stratum comprising the coal vein. It bases its argument on the supposed precedent of several ancient cases. Since the case of *Caldwell v. Fulton,* 31 Pa. (7 Casey) 475 (1858) coal ownership has been considered in the nature of a corporeal hereditament, severable from the surface, and attended with all the attributes of other forms of land ownership.[7] In *Lillibridge v. Lackawanna Coal Co.,* 143 Pa. 293, 22 A. 1035 (1891), the question arose whether the surface owner could enjoin the coal owner from transporting coal mined under an adjacent tract through

7. *Caldwell v. Fulton,* 31 Pa. (7 Casey) 475 (1858) involved the construction of a deed which transferred land but purportedly granted only an incorporeal right to the coal underlying the land.

Caldwell's father deeded the tract over to one Greer who sold undivided moieties to Bell and Case. Bell sold his undivided moiety to McCune, whereupon McCune and Case made partition by deed. Fulton (McCune's lessee) entered upon the tract and dug coal.

Caldwell brought suit against Fulton seeking to recover damages for the taking of the coal which Caldwell claimed through devise from his father. The theory of Caldwell's action was that the deed from his father to Greer granted the latter only a right to take the coal and not its title, that this right was an incorporeal hereditament and that the partition of the land by McCune and Case extinguished the incoporeal hereditament because such hereditaments are non-divisible.

On appeal, the Supreme Court rejected the incorporeal hereditament argument for several reasons. First, it was of the opinion that coal is land and that "those hereditaments only are incorporeal which are not land." *Id.* at 479. It reached the conclusion that coal is land based on the case of *Wilson v. Mackreth,* 3 Burrow 1824, 97 Eng.Rep. 1119 (1766) which held that an action for trespass *quaere clausum fregit* would lie against one who had entered another's close, dug peat and turf and carried it away. Secondly, the Court held that the grantor had granted the whole usufruct and entire dominion over the coal to the grantee, that he could not have reserved anything in himself and that this was therefore not a mere license to take the coal. Third, the Court was not inclined to accept the incorporeal hereditament argument because the need so to classify interests in coal in Britain was based on the principle of livery of seisin, and that principle no longer held sway in Pennsylvania.

The Court's opinions in *Caldwell* (one in 1855 and the other in 1858, both printed at 31 Pa. 475 ff.), although they refer to "substrata," do not hold that a coal deed grants a fee simple in the geological situs of the coal, despite the holding that coal ownership is a type of corporeal hereditament.

shafts and passageways cut in the coal under the first tract. The Court held that since the coal was a corporeal hereditament under *Caldwell v. Fulton, supra,* and that no injury to the complainant was either proved or averred, the coal owner could not be enjoined as the complainant desired. In its opinion in *Lillibridge* the Court stated the following:

> The proposition that the plaintiffs have a fee in the chamber or space left by the removal of the coal, antagonistic to the right of the defendant to use it, is a novel one. No authority is cited to support it, and it seems quite incongruous with the admitted ownership and estate of the defendant in the coal displaced. Under all the decisions, the coal in place was absolutely owned in fee-simple by the defendant. In a state of nature, the coal necessarily occupied space. How could the defendant own the coal absolutely and in fee-simple, and not own the space it occupied? Or, how is it possible to conceive of such a thing as the ownership of the space independently of the coal? If the coal in place is a part of the very substance of the soil, more corporeal than the surface, as was said in *Caldwell v. Fulton,* how can the law regard the space which the substance occupies, as other than the substance itself? Of course, such an idea is incapable of practical application, except upon the theory that the coal is not a corporeal substance to be sold and delivered, but that only an incorporeal right to remove it passes to the grantee under a conveyance. And such is the real nature of the appellants' argument. It could not be otherwise. Certainly, if such were the nature of the defendant's right, the argument and the authorities cited in support of it would be applicable and of controlling force; but it is a sufficient reply to all of them to say that all the decisions are directly the other way, and that they all establish that a conveyance of the coal in fee carries everything with it, just as fully and completely as a conveyance of the soil above.

*Lillibridge v. Lackawanna Coal Co.,* 143 Pa. at 301–302, 22 A. at 1037.

U.S. Steel also relies on the leading case of *Chartiers Block Coal Co. v. Mellon,* 152 Pa. 286, 25 A. 597 (1893). In *Chartiers Block* the coal company purchased the subsurface coal in 1881, ten years or so before the surface owner became aware that there was valuable natural gas deep under the coal vein. Because he had been unaware both of the value and existence of this natural gas the surface owner neglected to reserve the right to drill through the coal in order to exploit the natural gas. In 1891 the surface owner leased the oil and gas rights to Mellon, who began at once to drill for it. The coal company brought suit in equity seeking to enjoin Mellon from further drilling, which it was alleged would cause irreparable harm to the coal company's interest in the coal. The lower court granted the injunction against any future drilling, but allowed drilling to continue on those wells already begun, provided Mellon post adequate security. The Supreme Court affirmed the lower court's decree because it agreed with the ruling that the surface owner maintained an implied right of access to all substrata the title to which he retained. U.S. Steel would have us focus our attention on dictum in the Court's opinion which appears to imply that ownership of coal is in fact ownership of its geological situs, i.e. the stratum, and analogous to ownership of a surface tract:

> The mining of coal and other minerals is constantly developing new questions. Formerly a man who owned the surface owned it to the centre of the earth. Now the surface of the land may be separated from the different strata underneath it, and there may be as many different owners as there are strata: *Lillibridge v. Coal Company,* 143 Pa. 293, 22 A. 1035.
>
> *        *        *        *        *        *
>
> So it often happens that the owner of a farm sells the land to one man, the iron or oil, or gas to another, giving to each purchaser a deed, or conveyance in fee simple for his particular deposit or stratum, while he retains the surface for settlement and cultivation precisely as he held it before. The severance is complete for all legal and

practical purposes. Each of the separate layers or strata becomes a subject of taxation, of incumbrance, levy, and sale, precisely like the surface.... Prior to the sale of the coal his estate, as before observed, reached from the heavens to the centre of the earth. With the exception of the coal his estate is still bounded by those limits....

*Chartiers Block Coal Co. v. Mellon,* 152 Pa. at 295–96, 25 A. at 598. In response, appellees cite other dictum in *Chartiers* which seems to say that there is no legal right to the geological situs of the coal, but only a right to extract the coal and those rights incidental to the right of extraction:

Practically considered the grant of the coal is the grant of a right to remove it. This grant is sometimes limited in point of time; in others it is without limit. In either event it is the grant of an estate determinable upon the removal of the coal. It is moreover, a grant of an estate which owes a servitude of support to the surface. When the coal is all removed, the estate ends for the plain reason that the subject of it has been carried away.

*Id.,* 152 Pa. at 296, 25 A. at 599. Appellees also cite the case of *Webber v. Vogel,* 189 Pa. 156, 42 A. 4 (1899) which refined the holding in *Lillibridge.* In *Webber* the Court held that a coal owner has the implicit right to transport coal under the surface tract so long as the coal owner has maintained mining operations in good faith. There the Court stated:

While there exists by the deed to the grantee an estate in fee simple in the severed coal, and his right to the space mined out will not be distinguished from that in which the coal remains unmined, that estate, except in very rare cases, has no badge of perpetuity. In nearly every case, the instrument itself discloses the intention of the parties, that the coal shall be mined; that is, that the subject of the grant shall soon be exhausted or consumed; it is severed from the under and overlying land for the purpose of turning it into money; it would not only be a perversion of the intention to merely use such an estate to reach other coal, but such use would be a continual menace to the stability of the surface; no owner of the upper land

could tell when his estate would cease to be disturbed by workings underneath. It was intended to go no further in the case cited, [*Lillibridge v. Lackawanna Coal Co., supra*] than to hold, that while the purchaser of the coal was in good faith mining out his coal, his right to the use of the space made vacant by his workings as they progressed, could not be successfully obstructed by the owner of the surface; and not that by the purchase of the coal, he obtained an undisputed and perpetual right of way under another's land. The owner of the land above and below has a right to the reversion of the space occupied by the coal within a time contemplated by the parties when they sever that peculiar part of the land from its horizontal adjoiners.

*Webber v. Vogel,* 189 Pa. at 160, 42 A. at 5.

■ As we read these cases neither *Lillibridge* nor *Chartiers Block* nor *Webber* stands for the proposition that title to coal in place is title to the space made vacant by the coal removal. Craig and Myers point clearly to this analysis: that is to say, that despite repeated references to coal as land it is not truly land (although it be *terra firma*) but a mineral deposited within the land *and its ownership not* truly a corporeal hereditament but a divisible incorporeal right different from the incorporeal hereditament disapproved of in *Caldwell v. Fulton.* *See* Craig & Myers, *Ownership of Methane Gas in Coal Beds,* 24 Rocky Mt. Min. Inst. 767 (1978). They write:

Horizontal division of land ownership is, however, more a metaphor than a legal definition of the relative rights of surface and mineral owners; a particular mineral substance such as coal or gas, and not any given stratum is the true subject of the conveyance. Pennsylvania law has long recognized the possibility of separate ownership of each of the valuable constituent parts of a given tract. The owner of each mineral has all the rights of a fee owner as to that mineral in addition to the right to use the surface insofar as such use is necessary to extract the mineral.

Craig & Myers, *id.* at 774. Craig and Myers proceed to cite as their authority the same obiter dicta cited to us by U.S. Steel. We think this a far better reading of *Chartiers Block, Lillibridge* and *Webber* than that proposed by U.S. Steel.

## 2.

■ U.S. Steel next argues that at the time of the execution of the severance deeds, coal and coalbed gas were commonly identified, and insofar as questions of ownership were concerned, considered as essentially different aspects of the same substance.[8] U.S. Steel claims that this identification was true in the scientific community, the gas, oil and coal industries, and the general population.

The chancellor found that at the time of the execution of the coal severance deeds it was well known that coal mines always contained some coalbed gas. He also found that coal and coalbed gas arose at the same geological time from the same decaying matter. However, the chancellor did not find that this was common knowledge at the time, or that it was then commonly accepted as scientific fact.[9] Thus, despite the general knowledge that coal mines often contain dangerous gases (coalbed gas) and that these gases are likely either to kill if inhaled or to explode if inadvertently ignited we cannot say that at the time of the execution of the severance deeds that there was any common understanding that the coalbed gas is intimately connected with the coal itself.

---

**8.** U.S. Steel does not claim that coal and coalbed gas are the same substance in different states of matter, and correctly not. Rather, it contends that geologically and physically they are so intimately bound up as to be essentially inseparable.

**9.** Indeed, one of the authorities referred to by appellees' principal witness, a certain Professor Headless, was of the opinion that coalbed gas was gas which had migrated to the coal seam from lower strata and become trapped. Although we are not in a position to judge the acceptance of Professor Headlee's views by the scientific community at the time of their publication, they do tend to support the chancellor's finding that coal and coalbed gas were not generally viewed as U.S. Steel would have us believe. *See* Price & Headlee, *Physical and Chemical Properties of Natural Gas in West Virginia,* 9 W.Va. Geol. Survey ____ (1937).

As regards the legal background at the time of the execution of these deeds, we are reminded of the so-called *Dunham* rule, peculiar to the law of Pennsylvania, that natural gas is not a mineral, as that term is commonly understood, and thus does not pass under a deed severing coal and other minerals from the surface tract. See *Dunham & Shortt v. Kirkpatrick*, 101 Pa. 36, 47 Am.Rep. 696 (1882). Although the *Dunham* rule specifically applies to natural gas, as distinguished from coalbed gas, we see no reason why we cannot employ it here by analogy, particularly when the rule was adopted nearly half a century before the execution of the coal severance deeds. At the time when the *Dunham* rule was adopted there seems to have been little, distinction made between coalbed and natural gas, and it would appear that this failure to distinguish between the two gases—so similar in composition—continued at least until after the execution of these coal deeds.

### 3.

■ Thirdly, U.S. Steel argues that the right to drill through the coal seam in order to recover gas reserved by the grantors in the severance deeds does not include the reservation of the right to recover the coalbed gas contained in the coal seam. The argument ignores both the historical facts of gas exploitation in the region and the law of gas ownership in Pennsylvania. The chancellor found that at the time the coal severance deeds were executed the practice in the gas industry was to take gas from any stratum or geological formation which produced it in paying or marketable quantities. When a particular stratum was exhausted of its marketable gas the well would customarily be drilled deeper until sufficient gas was again encountered. The chancellor specifically found that in numerous instances gas was taken from coal seams and the well then drilled deeper to gas-bearing sands. And he found that in several instances gas was removed solely from the coal seam, and that for substantial periods of time.

Pennsylvania has long adhered to the "ownership in place" theory of title to oil and gas. See *Hamilton v. Foster,* 272

Pa. 95, 116 A. 50 (1922); *and see* Williams & Meyers, *Oil and Gas Law* 48 (1981). *Hamilton* refuted earlier cases which apparently followed the so-called "non-ownership" theory of title and specifically renounced the notion that the latter constituted the law in Pennsylvania. In *Hamilton* the Court criticized the plaintiff-appellants for trying to expand dictum in *Westmoreland & Cambria Natural Gas Co. v. De-Witt,* 130 Pa. 235, 18 A. 724 (1889). That case apparently classed oil and gas as *ferae naturae.* The *Westmoreland & Cambria Natural Gas* case based this classification on the scientifically faulty conclusion in *Brown v. Vandergrift,* 80 Pa. (30 P.F. Smith) 142 (1875) that oil and gas lead a "fugitive and wandering existence" beneath the surface of the land. *Id.,* 80 Pa. at 147. In *Hamilton,* the court protested that it had not intended to hold in *Westmoreland & Cambria Natural Gas,* nor had it held, that oil and gas were as incapable of ownership as wild animals.[10]

U.S. Steel's argument begs the very question it asks. The argument assumes that the surface owners intended to part with the rights to the coalbed gas when they granted the rights to the coal. Even reading the reservations strictly against the grantors, the most that can be said of the clause is that the surface owners were aware of the fact that there might be gas on the premises and that they might be held liable for damages to the coal if they were obliged to drill through it to extract the gas, and that to avoid this liability

**10.** The Court stated:
The *Westmoreland & Cambria* case does not determine that oil and gas are not capable of ownership, even when in place. . . . On the contrary, in this state these matters are firmly established otherwise.
*Hamilton* 272 Pa. at 102, 116 A. at 52.
As we now know, gases, though fugacious in nature and capable of migration and expansion, do not engage in random subterranean wanderings. As Hemingway has noted, although oil and gas are capable of migration they are not free-moving so much as they are amenable to the laws of physics. *See* Hemingway, *The Law of Oil and Gas,* 12 (1971). Until a "reservoir" is pierced by drilling or disturbed by natural consequences the oil or gas remains relatively static and trapped within a particular geological formation. *Id. See also* Comment, *Ownership of a Coalbed Gas: United States Steel Corp. v. Hoge,* 82 W.Va.L.R. 1451 (1980).

they reserved the right to drill through the coal without any imputation of liability to the severed estate.

4.

U.S. Steel's fourth argument rests on the right granted by the severance deeds to ventilate the coalbed gas. The chancellor's conclusion of law regarding the right of ventilation reads:

> The right of the owner of the coal to ventilate the mine, legally is that and nothing more. It gives the coal owners the right to bring fresh air into the mine and draw stale air, gases and fumes out of the mine, and to waste the coal bed gas, or capture it at its pleasure, in the course of mining, but this creates no property right by reason thereof in the coal bed gas, except that the coal owner, if he chooses, could capture the gas released in the course of the mining operation and make separate sale of it.

In reaching this conclusion the chancellor relied on the case of *Kier v. Peterson,* 41 Pa. (5 Wright) 357 (1862). U.S. Steel argues that the right to ventilate the coal extends further than the chancellor concluded, i.e., that it creates an absolute right of ownership in the ventilated gas.[11] The facts of *Kier* are as follows: In 1837 Peterson leased to Thomas and Samuel Kier a certain piece of land in Allegheny County. As part of the lease Peterson granted the Kiers the right to bore salt-wells and to mine coal. The lease was for an indefinite term to last as long as the Kiers, or the survivor of them, or their assigns, maintained the salt-wells, the construction of which was contemplated by the lease. The lessees sunk a salt-well in 1839. In 1845 oil began to rise with the brine from the salt-well. The lessor brought an action in trover seeking to recover the oil from his lessees.

11. Appellees filed no exceptions nor an appeal and thus have not challenged the chancellor's conclusion that the coal owner has a right to the coalbed gas released through mining. Even if we were to conclude that the chancellor erred in this regard, we would be constrained to affirm his ruling, because the question is not presented to us. We consider *Kier v. Peterson, supra,* not so much for the question of whether appellant has the limited right expressed by the chancellor but for the question of whether appellant was the absolute right it now posits.

The Supreme Court stated that the question before it was, to whom did the oil belong, to Peterson or to the lessees. The Court held that because the lessees were tenants for life with the full right of exploitation of the underlying salt they could not be charged with the waste of the oil. The opinion laid great weight upon the fact that oil and salt deposits are commonly geologically associated. Justice Read, writing for the majority of the Court, went on to state:

> The presence therefore of petroleum or mineral oil is naturally to be expected in the salt formations west of the Allegheny Mountains, and although its great value has not been fully appreciated until within a few years, still if it comes up as in the present instance, with the brine of a well which was opened in pursuance of, and must regularly be worked by, the express stipulations of the lease, *it must belong to the lessee, who must separate it from the salt, and either let it run to waste or prepare it for the market* .... Upon the whole, we are of the opinion that the petroleum which is sought to be recovered in this action was the property of the defendant below....

*Id.*, 41 Pa. at 361–62. (Emphasis ours).[12] Thus, *Kier* would seem to support the proposition advanced by U.S. Steel. There exists a line of cases, however, which arguably compels a result different from that dictated by the *Kier* case.

*Erwin v. Hoch*, 7 Sad. 477, *sub nom. Appeal of Erwin*, 12 A. 149 (Pa. 1887) involved a lease for certain land in Berks County. The lease granted the lessee the exclusive right to

12. *Cf. Hail v. Reed*, 54 Ky. 383, 15 B.Mon. 479 (1854), which is the earliest known common-law decision dealing with the property rights in oil and gas in place. Like *Kier v. Peterson, supra,* it involved oil which rose in connection with the production of brine from a saltwell. The action in trover was brought by the landowner to recover 120 gallons of oil. The Kentucky Court held that trover *would* lie for the recovery of the oil because in this case the defendants had entered the plaintiff's close without permission, and drilled the saltwell likewise. The plaintiffs were non-suited on their trespass action, however. The Court refused to accept the defendants' arguments that the oil was theirs by the sweat of their brows or that it became theirs once it had been severed from the land. The defendants had no right to the brine and hence also no right to the oil which rose with it.

dig and carry away iron ore found on the premises, as well as the right to wash the ore there if necessary. The term of the lease was fifteen years. The lessee entered into possession and began to mine and wash the ore. The residue from the washing (ocher) collected in a mud dam on the property. It was subsequently discovered that the ocher could be profitably employed in the manufacture of paint, for which purpose the lessee began to remove it from the dam. The lessor, Hoch, brought an action in equity seeking to restrain Erwin from removing the ocher, maintaining that Erwin had no right to it under the lease. The chancellor held that because the value of the residue was unknown at the time the lease was executed it could not have been within the contemplation of the parties that it pass under the lease and thus that it belonged to the landowner and not the lessee. On appeal, the Supreme Court approved the reasoning of the chancellor and affirmed the decree enjoining the lessee from further removing the ocher. *Doster v. Friedensville Zinc Co.,* 140 Pa. 147, 21 A. 251 (1891) involved a lease of ten years for the removal of zinc and iron ores. The lessee mined only zinc ores, which ores were embedded in rock. The rock was crushed and processed to relieve it of all but 7% of the zinc. (To remove the remainder of the zinc the crushed rock would have to have been pulverized and washed. The lessee at no time contemplated doing this.) The crushed rock was then normally discarded, but some was sold for use in the building of roads or in the making of artificial stone. The lessor brought an action in equity to recover the value of the crushed rock the lessee had sold, and to enjoin him from exerting further dominion over it. In granting the petition the chancellor relied on the *Erwin* case for the proposition that the residue, now found to be of value as evidenced by its sale, did not pass under the lease to the lessee. The Supreme Court affirmed on the opinion of the "learned" chancellor.

It would appear on first blush that *Kier* is contradicted by *Erwin* and *Doster,* yet neither *Erwin* nor *Doster* overrules *Kier,* nor has any of the three cases been otherwise over-

ruled. Perhaps it is however, that *Erwin* and *Doster* can be distinguished from *Kier*. The lease in *Erwin* was for a term of fifteen years and the lease in *Doster* was for a term of ten years, but, the lease in *Kier* essentially granted the lessees a fee simple determinable in the estate. The Kier brothers' interest would last so long as they continued the operation of the salt-well. Furthermore, the oil in *Kier* rose naturally with the brine and must either have been barrelled or left to run to waste. On the other hand, in both *Erwin* and *Doster*, the residues in question resulted from the processing of the ores following their severance from the land. It is true that the materials comprising the residues were extracted along with the ores, but the leases contemplated that the raw ores would be processed on the premises and the residue left behind. In *Doster*, the chancellor wrote of the residue:

> The whole was thrown away and treated as waste. All concerned were satisfied with that method of mining. It belonged and still belongs to the landowners, the same as the limestone, rock and loam and clay. The parties, when they contracted, did not contemplate that the waste left on the premises should be the property of the lessees, nor that they should pay for it.

*Doster v. Friendensville Zinc Co.,* 140 Pa. at 152, 21 A. at 252. The distinction between the cases must lie in the fact that the oil in *Kier* must have been used or wasted following its extraction, but in the other cases the residue could be left upon the land, according to the terms of the leases, and used later by the landowner.[13]

As in *Kier,* the coal deeds in the instant case created an estate analogous to a fee simple determinable. That is, when the coal under the surface tract runs out and when the coal owner no longer is actively mining the coal under connected or nearby tracts then the full title to land from the surface to the center of the earth reverts to the surface

---

**13.** *But see* Craig & Myers, *Ownership of Methane Gas in Coalbeds, supra* at 794–95. They are of the opinion that this distinction is not significant enough to overcome the fundamental disparity in the result in *Kier* and the *Erwin* and *Doster* cases.

owner. And, as the mining of salt in *Kier* necessarily raised oil, instantly, the mining of the coal must necessarily result in the release of a certain quantity of coalbed gas. The coalbed gas is initially released by the process of extracting the coal, much as the oil necessarily rose with the brine in *Kier*. Furthermore, the coalbed gas will either be collected by the coal owner or dispelled into the atmosphere, i.e., wasted. In *Erwin* and *Doster* the leases granted the lessees the right to process the ores on the leased premises following their extraction and to leave the residue resulting therefrom behind, but there the residue would not be wasted by the failure to collect it. Reading these cases in light of the facts of the instant case, the most we can conclude is that if the coal owner reduces the coalbed gas to his possession as it is released incidental to mining the coal and removed from the mine pursuant to the right of ventilation rather than wasting it into the atmosphere, then he is entitled to its possession and the profits from its sale, if any, just as the chancellor held. Based on these cases we cannot conclude, however, that the coal owner has an absolute right to all coalbed gas in place.

5.

U.S. Steel's final argument makes an appeal to this Court based on considerations of public policy. It is joined therein by the Keystone Bituminous Coal Association, which has filed a brief *amicus curiae*.

■ We have already held that U.S. Steel may exploit the coalbed gas released in its mining operations based both on the coal severance deeds and the logic of the *Kier* case. Aside from that limited holding, essentially affirming the chancellor's conclusions of law,[14] the cases would seem to point toward a clear victory for the landowners and their gas lessee. Indeed, Craig and Myers are of the mind that such would be the proper result in this case. *See* Craig & Meyers, *Ownership of Methane Gas in Coalbeds, supra.* Based on the legal setting and factual background adhering

14. See note 11 *supra*.

at the time of the deeds' execution, we cannot say that the parties intended title to coalbed gas to pass to the coal owners under the deeds. It appears that their intention was quite the opposite. We agree with the chancellor's conclusion that

> ... it cannot be reasonably presumed that the intent of the purchasers of the coal was to include the purchase of coal bed [sic] gas, nor that the intent of the landowner was to include it in the sale of the coal. If any intent can be reasonably inferred, it was that the landowner intended to sell the coal to one purchaser and the [coalbed] gas and [other] gases to another.

This is not to say that U.S. Steel's public policy argument is not an appealing one, for it cannot be argued to the contrary that public policy favors rational exploitation of energy resources with an eye to the efficient, low cost production of all those resources.[15] However, it must also be remembered that in general equity follows the law. Under the facts of this case we are not convinced that U.S. Steel has demonstrated the legal right to coalbed gas other than that liberated during the coal mining, or its incidental procedures necessary to ensure the safety of the miners.[16] Nor are we

---

**15.** *See* Mutchler & Sachse, *Legal Aspects of Coalbed Gas,* Journal of Petroleum Technology 1861 (October, 1981). Mutchler and Sachse recommend that the maximum utilization of energy resources be considered one of the primary objectives in resolving ownership problems involving coalbed gas.

**16.** We must keep in mind that the issue before us is the interpretation of instruments of transfer—coal severance deeds—and not the lack of wisdom or prescience with which those deeds were drawn, or the impracticability of the transferred natural resources' exploitation in accordance with the terms of those instruments.

It is clear from the record that ownership of the coalbed gas did figure into the negotiation and drafting of these deeds, if only from the practice common at the time. At the time of the coal deeds' execution "firedamp," or coalbed gas, was not viewed as a valuable substance. But this was so because when denominated as "firedamp" the substance had a propensity for killing miners. However, it is equally clear from the record that given a different epithet, and in a different context, coalbed gas was rather routinely exploited when found in sufficient or "paying" quantities. Based on the evidence adduced at trial the chancellor found that little if any

convinced that the equitable considerations of this case mandate a result different than the one reached under the applicable legal principles. Accordingly, the final decree of the chancellor is affirmed.[17]

distinction was made in the gas industry at the time of the coal deeds' execution between the gas found in coalbeds (coalbed gas) and the gas found in oil-and-gas-bearing sands (natural gas). This was primarily true because of the gases' remarkably similar chemical compositions and b.t.u. capacities. *See* n. 2 *supra.* At the time in question, the difference in the gases' geological generation played a paltry part in their economic exploitation. It is in this vein that the deeds must be interpreted, and not with the wisdom of Epimetheus.

As for U.S. Steel's invocation of the geological and generational link between coal and coalbed gas, we note that a similar nexus exists between petroleum and "natural gas." Yet, these latter resources are systematically viewed as distinct and are routinely so dealt with. Nor is the geological association of "salts" and petroleum, as in the *Kier* case, more telling, for in *Kier* the Court held only that the lessees were entitled to the oil which rose with the brine and not to all the oil that might have been extracted.

17. We feel obliged to make the following *Caveat.* That is, from the date of this decision it will be necessary for landowners and potential purchasers of their oil, gas and coal rights to proceed with caution in the drafting of the applicable transfer instruments. The parties and their scriveners must be careful to include coalbed gas in their negotiations and agreements lest the failure to do so result in unnecessary and potentially costly litigation.