507 A.2d 882

The School District of Philadelphia, Appellant *v.* William B. Friedman, Appellee.

268

Argued December 9, 1985, before Judges ROGERS, and PALLADINO, and Senior Judge BARBIERI, sitting as a panel of three.

*Andrew M. Rosen,* for appellant.

*R. Michael Carr, LaBrum and Doak,* for appellee.

Opinion by Senior Judge Barbieri, April 7, 1986:

This is the appeal of the School District of Philadelphia (School District) from a final decree in equity of the Court of Common Pleas of Philadelphia County ordering it to reinstate William B. Friedman, with back pay, to his position of Programmer II in its data processing department. After a hearing on Friedman's complaint in equity seeking injunctive relief, the chancellor, the Honorable Berel Caesar, entered a decree nisi directing Friedman's reinstatement because the School District's action of discharging him was in violation of Section 5 of the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §955(a). Section 5 of the Act, 43 P.S. §955, states in relevant part that "[i]t shall be an unlawful discriminatory practice ... (a) For an employer because of the ... non-job related handicap or disability of any individual ... to bar or to discharge from employment such individual ... if the individual is the best able and most competent to perform the services required...." The chancellor allowed some, but dismissed most, of the School District's exceptions to his adjudication nisi, and he entered his decree nisi as the final decree. This, as we have said, ordered the School District to reinstate Friedman with back pay. This appeal followed.

Friedman began as a volunteer in the School District's data processing department in 1969. In January

1970, Friedman was hired as a computer programmer trainee and continued in the School District's employ until May 2, 1980, when he was discharged for chronic lateness. Friedman had failed to arrive for work on time almost everyday of his employment.

Following his discharge, Friedman filed a complaint with the Pennsylvania Human Relations Commission (PHRC) asserting that the School District had discriminated against him by discharging him because of his alleged mental disability, a personality disorder a manifestation of which is chronic lateness, which was not job-related. In accordance with Section 9 of the Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §959, the PHRC, after the filing of the complaint, made an investigation and subsequently determined that no probable cause existed for crediting the allegations of the complaint. As permitted by Section 6 of the Act, 43 P.S. §962(c), Friedman then filed his complaint in equity in the Philadelphia County Court of Common Pleas.

In employment discrimination cases, the complainant, or as in this equity action, the plaintiff, bears the burden of establishing a *prima facie* case which, in this case, requires proof that Friedman is disabled, that he was appointed to a position for which he was otherwise qualified, that he was discharged, and that his employer replaced him with someone with equal or lesser qualifications. *See General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976). Once the *prima facie* case is established, the burden then shifts to the employer to establish a legitimate, non-discriminatory reason for the denial of employment. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Thus, provided Friedman has met his burden of establishing that he is disabled under the Act, it becomes the School District's burden to establish that Friedman's disability is job-related and, therefore,

provides a valid basis for the discharge. *Amtrak v. Pennsylvania Human Relations Commission,* 70 Pa. Commonwealth Ct. 62, 452 A.2d 301 (1982).

After an evidentiary hearing, the chancellor made numerous findings of fact and concluded:

1. Plaintiff William B. Friedman is disabled under the Pennsylvania Human Relations Act, 43 P.S. §955.

2. Mr. Friedman's disability did not interfere substantially with his performance and was therefore non-job related.

3. (a) Mr. Friedman's disability can be, and has been, reasonably accommodated by the School District;

(b) Said reasonable accommodation does not impose undue hardship on the School District.

4. Mr. Friedman is qualified for the position for which he seeks reinstatement. (Footnote omitted.)

On appeal, the School District asserts (1) that the court erred in concluding that Friedman is disabled as provided by Section 5 of the Act, 43 P.S. §955, and further defined by regulation at 16 Pa. Code §44.4, (2) that the court erred in concluding that Friedman's chronic lateness is not job-related, (3) that the court erred in concluding that accommodating Friedman's chronic lateness does not impose undue hardship on the School District, and (4) that the testimony of Friedman's experts was improperly admitted into evidence.

The scope of our review of a chancellor's adjudication is very narrow. It has been held that determinations of a chancellor will not be disturbed on appeal unless they are clearly erroneous as a matter of law or are in manifest abuse of the chancellor's sound discretion. *Borough of Yeadon v. Montgomery,* 72 Pa. Commonwealth Ct. 31, 455 A.2d 785 (1983); *Quaker City Yacht Club v.*

*Leon B. Williams,* 59 Pa. Commonwealth Ct. 256, 429 A.2d 1204 (1981). The chancellor's findings of fact are controlling on appeal unless it can be shown that they lack evidentiary support, or that the chancellor capriciously disbelieved the evidence or abused his discretion in arriving at those findings. *United States Steel Corp. v. Hoge,* 304 Pa. Superior Ct. 182, 450 A.2d 162 (1982), *rev'd and remanded on other grounds,* 503 Pa. 140, 468 A.2d 1380 (1983).

As support for the chancellor's conclusion that Friedman is disabled under the Act, the chancellor found that the School District's physician diagnosed Friedman's condition as a "neurotic compulsion for lateness" and that the School District had received from John E. Mock, M.D., Friedman's treating psychiatrist of ten years, a letter which labelled Friedman's chronic lateness a "behavioral aberration." The chancellor also found that, commencing April 8, 1980, Friedman began being treated by Dr. Susan Jasin, a clinical psychologist trained in behavioral modification therapy. Finally, the chancellor found that "William B. Friedman, at all times relevant hereto, suffered from, and continues to suffer from, a mental disability, as a result of which he is chronically late for virtually all of his life's activities, including reporting for work."

Our study of the record leads us to conclude there is no support for the above finding and the chancellor's conclusion of law in this regard. In order to establish a disability under the Act, reference must be made to 16 Pa. Code §44.4 which defines "handicapped or disabled person" as follows:

(i)  A person who:

(A)  has a physical or mental impairment which substantially limits one or more major life activities;

(B)  has a record of such an impairment; or

(C)  is regarded as having such an impairment.

(ii)  As used in subparagraph (i) of this paragraph, the phrase:

(A)  '... mental impairment' means a physiological disorder or condition, ... a mental or psychological disorder, such as mental illness, and specific learning disabilities.

(B)  'major life activities' means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

....

(D)  'is regarded as having an impairment' means has a physical or mental impairment that does not substantially limit major life activities but that is treated by an employer ... as constituting such a limitation; has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or has none of the impairments defined in subparagraph (i)(A) of this paragraph but is treated by an employer ... as having such an impairment.

The evidence of record includes a letter from Dr. Mock to the School District in 1976 in response to its request for information regarding Mr. Friedman's condition in which he stated:

His [Mr. Friedman's] symptom of persistent and almost invariable lateness, which incidently manifests itself in virtually all situations and is not confined to the work environment, is a behavioral aberration that is deeply rooted in his personality and almost certainly had its origins in conflictual interaction with his parents in early life. It seems to be a rather infantile and cer-

tainly self defeating way of rebelliously asserting his individuality and of refusing to submit to the rules set down by authority. Although I recognize that his lateness is disruptive to an organization that includes a uniform work schedule in its structure, it is a comparatively benign expression of his determination not to be obliterated by a dominating controlling system of which he conceives himself as a victim. I would like to emphasize an obvious fact, namely that his motivation and rationale for this behavior is almost completely unconscious and literally beyond his control.

. . . .

It is extremely questionable whether this deeply ingrained behavioral pattern will ever be modified by means of psychiatric intervention.

When pressed by the chancellor at the trial to categorize Mr. Friedman's condition, Dr. Mock declined to do so stating that there was no specific diagnostic label that could be used in Mr. Friedman's case. Dr. Mock did state that Mr. Friedman was not psychotic. When questioned regarding whether Mr. Friedman was neurotic, Dr. Mock testified as follows:

Q. Do you have an opinion as to whether he is neurotic?

A. Yes, I have an opinion.

Q. Would you tell us that opinion.

A. Personality disorder.

On cross-examination by appellant's counsel, Dr. Mock testified:

Q. (Continuing) Doctor, it's true, is it not, that people with what you have termed a personality disorder exists [sic] around us every day in all walks of life; isn't that correct?

A. I'm not sure any of us are spared that diagnosis.

Dr. Mock also testified on cross-examination that Mr. Friedman's condition did not impair his ability to care for himself, to walk, see, hear, speak, learn or work. In fact, the chancellor found that "Friedman, at all times relevant thereto, performed the duties incumbent upon him as a Computer Programmer in a competent and qualified manner, and with the skills required of a person with his job classification."

The record is solid that Mr. Friedman has no disability as that term is defined by regulation.[1] There is no evidence of a mental disability as defined by 16 Pa. Code §44.4 on the basis of which Friedman was discriminated against in violation of Section 5 of the Act, 43 P.S. §955(a).[2] We would note the similar conclusion

[1] Dr. Jasin's testimony is simply a description of the behavioral modification program which she had designed for Mr. Friedman. She made no attempt to diagnose Mr. Friedman's condition.

The testimony of Drs. Mock and Jasin was properly admitted into evidence. While the School District would contend that Dr. Mock's testimony was inadmissible pursuant to Pa. R.C.P. No. 4003.5(i)(b) which provides that, if the identity of the expert is not disclosed, he "shall not be permitted to testify," the School District failed to show prejudice. Where there is no showing of bad faith in late disclosures and no prejudice to the complaining party, the court may admit the expert's testimony. *Kemp v. Qualls,* 326 Pa. Superior Ct. 319, 473 A.2d 1369 (1984). The School District also objected at trial to the admission of Dr. Jasin's testimony offered through videotape deposition on the ground the testimony lacked proper foundation and that it could not qualify as expert testimony. Pa. R.C.P. No. 4016(b) provides that objections to the competency of a witness or to the competency, relevancy or materiality of testimony are waived by failure to make them during the taking of the deposition if the ground of the objection was known to the objecting party at the time. Both objections could have been made at the deposition and were not.

[2] We note that, while a plaintiff may also establish a disability under 16 Pa. Code §44.4 by proving that he is regarded by his employer as having such an impairment, Friedman made no such allegation when he filed his equity action in the common pleas court.

of the Pennsylvania Human Relations Commission whose expertise in the application of the provisions of the Act is generally accepted.

Having concluded that Mr. Friedman is not disabled under the Act, we need not address the question whether the School District had a legitimate non-discriminatory reason for discharging Friedman, *i.e.* whether Friedman's personality disorder was job-related, or whether accommodating the disorder imposed undue hardship on the School District. We note in passing, however, that 16 Pa. Code §44.14,[3] which requires an employer to make reasonable accommodations for a disabled worker, precludes application of different attendance standards for the disabled worker. Thus, even had Mr. Friedman's personality disorder been established as a disability under the Act, the School District would not have been required, by virtue of the above regulation, to accommodate Mr. Friedman's chronic lateness.

We will reverse the order of the Philadelphia County Court of Common Pleas. Mr. Friedman need not be reinstated.

## ORDER

AND NOW, this 7th day of April, 1986, the order of the Court of Common Pleas of Philadelphia County is hereby reversed.

---

[3] 16 Pa. Code §44.14 provides:

(a) An employer shall make reasonable accommodations by modifying a job, including but not limited to modification of duties, scheduling, amount or nature of training, assistance provided, and the like, provided that such modification shall not impose an undue hardship.

(b) Nothing in this section shall be construed to require application of different production, *attendance*, or disciplinary standards for the handicapped or disabled worker. (Emphasis added.)

Dissenting Opinion by Judge Rogers:

I respectfully dissent because I believe that the record supports Judge Caesar's findings and that his findings support his conclusions reached after a comprehensive consideration of the facts and the law, that Mr. Friedman suffered from a non-job-related handicap or disability and that the school district in discharging him on account of his handicap or disability violated Section 5(a) of the Pennsylvania Human Relations Act, 43 P.S. 955(a).

Mr. Friedman started as a volunteer in the school district's data processing department in 1969. In January 1970, he was hired by the school district as a computer programmer trainee. He was promoted twice and continued in the school district's employ until May 2, 1980. Mr. Friedman had often failed to arrive for work on time; however, he remained late at his work to make up for the time missed in the morning. In November 1975, Mr. Friedman's immediate supervisor and the head of the department discussed his lateness with him. They suggested and Mr. Friedman tried a different schedule to no avail. He submitted to examination by a school physician who diagnosed his condition as a "neurotic compulsion for lateness." The school district also requested and received a status report from Mr. Friedman's psychiatrist, a Dr. John E. Mock, who by letter dated June 19, 1976, wrote:

> [Friedman's] symptoms of persistent and almost invariable lateness, which incidentally manifests itself in virtually all situations and is not confined to the work environment, is a behavioral aberration that is deeply rooted in his personality and almost certainly had its origins in conflictual interaction with his parents in early life.
>
> . . . .
>
> I would like to emphasize an obvious fact, namely that his motivation and rationale for this

behavior is almost completely unconscious and literally beyond his control.

. . . .

It is extremely questionable whether this deeply engrained behavioral pattern will ever be modified by means of psychiatric intervention.

About six months after the date of this letter, Mr. Friedman was given his second promotion.

On August 8, 1979, a written warning was given to Mr. Friedman which stated: "Your inability to report to work on time at all severely restricts your ability to perform your duties and for management to function normally with respect to your work." Then on October 31, 1979, management issued an anectodal record which recommended that Mr. Friedman be "suspended and subsequently dismissed." As a result, a formal hearing was held on November 15, 1979, to review Mr. Friedman's lateness. Mr. Friedman was later placed on disciplinary suspension from December 3, 1979 until December 14, 1979 and thereafter on a three month probation. Following another hearing on April 18, 1980, Mr. Friedman was discharged.

Following his discharge, Mr. Friedman filed a complaint with the Pennsylvania Human Relations Commission on which the Commission issued a finding of "no cause." As permitted by Section 6 of the Act, *as amended,* added by Section 6 of the Act of December 19, 1974, P.L. 966, 43 P.S. §962(c), Mr. Friedman filed his complaint in equity.

After an evidentiary hearing, the chancellor made the following pertinent findings:

6. (a) Plaintiff's duties as a Programmer II consisted of preparing computer programs, pursuant to instructions of a systems analyst. All work was assigned to individual programmers by Mark J. Roder, who monitored the progress of

the programmers' work through weekly reports. The programmer read the analyst's requirements, consulted directly with the analyst, if necessary, prepared a program, tested it by having it run through a computer, and continued to test the program until it was completed to his, and the analyst's, satisfaction. If necessary, the programmer consulted further with the systems analyst or with other programmers;

(b)(i)   There was never any formal complaint about the quality of plaintiff's work or his productivity;

(ii)   Mr. Roder testified at trial that he had complained to plaintiff informally that he was 'frequently late with jobs'—that is, he took longer than the time Roder allotted for the task—but that he had never made a formal record of this. He further testified that other programmers also were late with jobs and that plaintiff's productivity pattern had been the same throughout his employment.

(iii)   Elmer G. Sayre, a systems analyst who had been with the School District for 17 years, testified that plaintiff had worked on several projects for him over the entire ten years, from 1970 to 1980, that in each case plaintiff had done a good job in reasonable time and that some of plaintiff's work product ('sub-routines') were still in regular use;

(iv)   A fellow employee, Jocelyn Berry, testified that plaintiff was very helpful to her when she had occasion to consult with him from time to time and that, on occasion, she had taken advantage of the fact that plaintiff was known to work late on a regular basis by calling after 4:30

p.m. to make a correction in her own work before it was processed by the computer that evening.

7. (a) In the summer of 1979, for the first time since March of 1976, Mr. Roder reinstituted efforts to compel plaintiff to report to work on time;

(b) On August 8, 1979, plaintiff was given formal notice that he had until the end of September 'to correct this problem.' In this memorandum plaintiff was told that:

Your inability to report to work on time at all severly [sic] restricts your ability to perform your duties and for management to function normally with respect to your work. (Exhibit D5)

(c) On October 31, 1979, management (Mr. Wollaver) filed a formal report recommending that plaintiff be suspended and subsequently dismissed 'because of his excessive lateness and the consequent adverse effect of this lateness on the operation of the Department' (Exhibit P12);

(d) As the result of a formal hearing . . . on November 15, 1979, plaintiff was suspended for ten days; from December 3 through December 14, 1979, and placed on a three-month probation, during which plaintiff was advised that he would be closely monitored as to whether he arrived by 8:45 a.m. each day;

(e) On many occasions between December 17, 1979 and March 14, 1980, plaintiff failed to arrive at work by 8:45 a.m., his period of lateness varying between one minute and fifty-five minutes (Exhibit P14);

(f) A further hearing was held . . . on April 18, 1980, as a result of which [it was] recommended that plaintiff's employment be terminated on May 2, 1980 (Exhibit P1);

(g)  At both hearings . . . no consideration was given as to whether or not plaintiff suffered from a mental disability.

8. (a)  During virtually the entire period in question, from April, 1971 to early 1980, plaintiff was being treated by a psychiatrist, Dr. Mock, in weekly group sessions in an effort to improve his punctuality. Mr. Friedman was diagnosed as suffering from a mental disability which made him chronically late for all engagements. Dr. Mock testified that the disorder was of very long standing and that there was little prospect for a cure or improvement. For many years prior to 1970, Mr. Friedman had been receiving out-patient therapy at Philadelphia General Hospital for the same problem of chronic lateness;

(b)  Management of the School District knew that plaintiff was being treated by a psychiatrist for his lateness problem. Mr. Wollaver acknowledged that he knew this before he sent plaintiff for a medical evaluation in 1976;

(c)  Commencing April 8, 1980, plaintiff was treated by Susan Jasin, a clinical psychologist trained in behavioral modification therapy, and his average lateness dropped to 6 minutes per day (Exhibit P24).

9. (a)  Management (Mr. Roder) asserted as a basis for action against Mr. Friedman that his irregular working hours adversely affected the operation of the Data Processing Department in two ways: (1) that it had a serious effect on production; and (2) that it had a serious effect on other employees (Exhibit D1 dated November 6, 1975; Exhibit D-4 dated August 2, 1979);

(b)  The evidence established, with respect to the effect on other employees, that two em-

ployees who were late for work and were repri-
manded referred to plaintiff's chronic lateness
and that no action was taken against him. Both of
these employees had ceased to work for the
School District by 1976;

(c)   With respect to production, the testimo-
ny offered by management was that:

(i)   Plaintiff's production was below that of
some other employees in that it frequently took
him longer than the alloted time to complete a
program;

(ii)   Plaintiff's programs were difficult to
follow—that is, if other employees tried to un-
derstand his programs they would have some dif-
ficulty in doing so but that, with additional time,
they could do so; and

(iii)   Plaintiff sometimes forgot that a partic-
ular job had been assigned to him.

The evidence established that these criti-
cisms or complaints were apparent from the
time plaintiff first came to work for the School
District and persisted to the end, without any
change (Roder testimony, September 12, 1983);

(iv)   In addition, there were some instances,
approximately in 1979, when Mr. Roder sought
to talk to Mr. Friedman while a program was on
the computer and Mr. Friedman had not yet ar-
rived at work. This apparently occurred during
a period when the computer system was in the
process of being changed over to the greater use
of terminals;

(d)(i)   In addition, Mr. Roder testified that
he called staff meetings on an irregular basis,
about once a month, and that plaintiff frequently
missed those meetings or was late;

(ii)   Plaintiff admitted being late for or miss-
ing staff meetings, but testified that he always

inquired and learned what happened at those meetings from other employees;

(e) No written memoranda or disciplinary actions were ever instituted with respect to the complaints alleged in this subparagraph 9, though Mr. Roder did speak to plaintiff about some of them.

10. The School District of Philadelphia had a policy with respect to disabled employees which sought to accommodate handicapped employees (Roder testimony, September 12, 1983).

11. Plaintiff, William B. Friedman, at all times relevant hereto, suffered from, and continues to suffer from, a mental disability, as a result of which he is chronically late for virtually all of his life's activities, including reporting for work.

12. Plaintiff, William B. Friedman, at all times relevant hereto, performed the duties incumbent upon him as a Computer Programmer in a competent and qualified manner, and with the skills required of a person with his job classification.

13. During the period of his employment, from January, 1970 to May, 1980, plaintiff's mental disability was not job related—that is to say, it did not substantially interfere with his ability to perform the essential functions of a Computer Programmer in the employ of the School District of Philadelphia.

14. No undue hardship would be imposed upon the School District of Philadelphia by requiring it to reinstate the plaintiff, because the evidence clearly indicates that the School District accommodated plaintiff's disability over virtually the entire period of his employment.

15. Plaintiff is willing to resume therapy, including behavior modification therapy, in a continuing effort to minimize his lateness.

16. Management of the Data Processing Department was the same during all periods relevant to this case. Mark Roder was the plaintiff's Supervisor at the School District's Data Processing Department from 1972 to May 2, 1980.

The chancellor concluded:

1. Plaintiff William B. Friedman is disabled under the Pennsylvania Human Relations Act, 43 P.S. §955.

2. Mr. Friedman's disability did not interfere substantially with his performance and was therefore non-job related.

3. (a) Mr. Friedman's disability can be, and has been, reasonably accommodated by the School District;

(b) Said reasonable accommodation does not impose undue hardship on the School District.

4. Mr. Friedman is qualified for the position for which he seeks reinstatement. (Footnote omitted.)

The scope of our review is narrow. Determinations of a chancellor will not be disturbed on appeal unless they are clearly erroneous as a matter of law or are in manifest abuse of the chancellor's sound discretion. *Borough of Yeadon v. Montgomery,* 72 Pa. Commonwealth Ct. 31, 455 A.2d 785 (1983); *Quaker City Yacht Club v. Leon B. Williams,* 59 Pa. Commonwealth Ct. 256, 429 A.2d 1204 (1981). A chancellor's findings of fact will not be disturbed on appeal where there is adequate evidence on the record to support these. *See Estate of Shelly,* 484 Pa. 322, 399 A.2d 98 (1979); *Brentwater*

*Homes, Inc. v. Weibley,* 471 Pa. 17, 369 A.2d 1172 (1977). The task of the reviewing court is to determine whether the record contains evidence which will support the chancellor's findings of fact, not to substitute our view of the evidence for his. *See Aiken Industries, Inc. v. Estate of Wilson,* 477 Pa. 34, 383 A.2d 808 (1978). Therefore, the chancellor's findings of fact are controlling on appeal unless it can be shown that they lack evidentiary support, or that the chancellor capriciously disbelieved the evidence or abused his discretion in arriving at those findings. *United States Steel Corp. v. Hoge,* 304 Pa. Superior Ct. 182, 450 A.2d 162 (1982), *rev'd and remanded on other grounds,* 503 Pa. 140, 468 A.2d 1380 (1983).

The school district's first contention is that the court erred in finding that Mr. Friedman was a handicapped or disabled person, that is, one who has a handicap or disability as provided by Section 5 of the Act, 43 P.S. §955, and further defined by regulation at 16 Pa. Code §44.4 as:

(i)   A person who:

(A)   has a physical or mental impairment which substantially limits one or more major life activities;

(B)   has a record of such an impairment; or

(C)   is regarded as having such an impairment.

(ii)   As used in subparagraph (i) of this paragraph, the phrase:

(A)   '. . . mental impairment' means a physiological disorder or condition, : . . . a mental or psychological disorder, such as mental illness, and specific learning disabilities.

(B)   'major life activities' means functions such as caring for one's self, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

. . . .

(D) 'is regarded as having an impairment' means has a physical or mental impairment that does not substantially limit major life activities but that is treated by an employer . . . as constituting such a limitation; has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or has none of the impairments defined in subparagraph (i)(A) of this paragraph but is treated by an employer . . . as having such an impairment.

Mr. Friedman's testimony supports his contention and the chancellor's finding of mental impairment as defined at 44 Pa. Code §44.4(i)(A). Mr. Friedman described the psychiatric treatment he received since he was a teenager. He testified that he had been honorably discharged from the armed services on account of a non-service connected disability, psychiatric in nature. He also testified that he received psychiatric treatment as an in-patient at Philadelphia General Hospital in 1964, that he then attended Horizon House (a social service agency serving former mental patients), and that he was treated for many years by Dr. Mock, a psychiatrist, and for a short period by Dr. Jasin, a clinical psychologist. Mr. Friedman also testified that he was referred to the school district for employment by Horizon House and two Horizon House counselors accompanied him to the school board administration building for his interview. All of this was on account of his inability to be prompt in getting to work.

The employer's records show that the school district's own doctor diagnosed Mr. Friedman's condition as "neurotic compulsion for lateness" and that Mr. Fried-

man had from the beginning informed the school district of his problem. This mental impairment obviously substantially limits one or more of Mr. Friedman's major life activities. Dr. Mock's letter is evidence that Mr. Friedman's symptom of persistent lateness manifests itself in all situations, not just employment.

The record shows that the school district regarded him as having an impairment as defined in 16 Pa. Code §44.4(ii)(D). The school district permitted him to work late to make up the time he missed, it gave him different schedules and despite his chronic lateness, promoted him twice with increases of salary.

The record clearly supports the chancellor's conclusion that Mr. Friedman was a disabled person. Was Mr. Friedman's disability job-related? A job-related disability or handicap is defined in Section 3 as one which substantially interferes with the ability to perform the essential functions of the job. The chancellor concluded that Friedman's disability did not interfere substantially with his performance and was therefore non-job related. Evidence of record supporting this conclusion is that Friedman was employed for more than ten years by the school district. During that time he was promoted and given increases in salary. He worked on his own schedule but the school district failed to prove that this substantially interfered with his performance. In the ten years Mr. Friedman worked for the school district, no formal complaints were ever lodged against him regarding his productivity or the quality of his work. In fact, one fellow employee testified that she took advantage of the fact that Friedman worked late by having him make corrections in programs in the evening so that they could be run that night.

The school district makes other arguments not treated by the majority. It says that Friedman's disability causes it undue hardship. Regulations at 16 Pa. Code §44.14 provide that:

(a) An employer shall make *reasonable accommodations* by modifying a job, including but not limited to modification of . . . *scheduling* . . . provided that such modification shall not impose an undue hardship.

(b) Nothing in this section shall be construed to require application of different production, *attendance,* or disciplinary standards for the handicapped or disabled worker. (Emphasis added.)

I first note that the school district's accommodation of Mr. Friedman was with reference to scheduling not attendance. No one testified that Mr. Friedman did not come to work. He came late and stayed later. Therefore, he was working on a schedule with which the school board accommodated him.

The Commission's regulation at 16 Pa. Code §44.4 also sets forth the factors to be considered in determining whether undue hardship is imposed by the requirement that a reasonable accommodation be made to a person's handicap or disability.

[They] . . . include, but are not limited to the following:

(i) The overall size and nature of a business, organization, program, or public accommodation, including number of employees, structure and composition of workforce, and number and type of facilities. However, financial capability to make reasonable accommodations shall only be a factor when raised as part of an undue hardship defense.

(ii) Good faith efforts previously made to accommodate similar handicaps or disabilities.

(iii) The extent, nature, and cost of the reasonable accommodation needed.

(iv) The extent to which handicapped or disabled persons can reasonably be expected to

need and desire to use, enjoy, or benefit from the employment or public accommodation which is the subject of the reasonable accommodation in question.

(v) Legal or proprietary interest in the subject of proposed reasonable accommodations including authority to make such accommodations under the terms of any *bona fide* agreement, such as a lease, governing or describing rights and duties with respect to the subject.

The chancellor found that the school district made reasonable accommodations of Mr. Friedman because of his disability for over ten years. Both Mr. Friedman and his supervisor testified that Mr. Friedman stayed at work late in the evenings to compensate for his late arrival. The school district has really not explained why this accommodation was undue hardship or would constitute undue hardship if continued.

The school district finally contends that the testimony of Mr. Friedman's experts was improperly admitted into evidence. I disagree.

The school district contends that Mr. Friedman failed properly to identify Dr. Mock and the testimony he would proffer in Answers to the school district's interrogatories and that the chancellor erred in admitting the testimony into evidence in the absence of extenuating circumstances. It cites Pa. R.C.P. 4003.5(i)(b) which provides that if the identity of the expert is not disclosed, he "shall not be permitted to testify" except that if the failure to disclose is the result of extenuating circumstances the court may grant a continuance or other appropriate relief. But, for the complaining party to invoke this drastic sanction he must show prejudice. *Royster v. McGowen Ford, Inc.*, 294 Pa. Superior Ct. 160, 439 A.2d 799 (1982). Where there is no showing of bad faith in late disclosure and no prejudice to the

complaining party, the court may admit the expert's testimony. *Kemp v. Qualls*, 326 Pa. Superior Ct. 319, 473 A.2d 1369 (1984). Here, the chancellor offered to accommodate the school district by giving the school district a continuance. The transcript reveals that in overruling the objection to Dr. Mock's testimony the chancellor made the following offer to the school district: "I do give you the opportunity to renew [your objection] and ask for a continuance for the purpose of cross-examining Dr. Mock, if you wish to do so, if you wish to ask for that opportunity."

I find nothing in the record indicating bad faith on the part of Mr. Friedman or prejudice to the school district. In fact, the school district had every reason to know that Dr. Mock would be called as a witness. Dr. Mock sent his report dated January 29, 1976, directly to the defendant. His testimony conformed to this report and in fact he quoted from it extensively. The school district's counsel had a copy of this report in his file.

Also, on August 17, 1983, counsel for the school district wrote to Mr. Friedman's counsel, in answer to (Friedman's) interrogatories of the petitioner: "The only expert I may consider at this time is Dr. Mock who I assume you may also use." Also Mr. Friedman's pre-trial memorandum filed August 16, 1983, listed Dr. Mock as a witness.

The school district also contends that Dr. Jasin's opinion, offered through videotape deposition, on the cause of Friedman's problem was inadmissible. No objection was made to this testimony during the deposition.

Pa. R.C.P. 4016(b) provides:

Objections to the competency of a witness or to the competency, relevancy or materiality of the testimony are not waived by failure to make

them before or during the taking of the deposition, *unless the ground of the objection is one which was known to the objecting party and which might have been obviated or removed at that time*. (Emphasis added.)

At the trial in September 1983, the school district objected to the admission of the testimony on the ground that it lacked proper foundation and that it could not qualify as expert testimony. The presence of the subject of objection was known or apparent to the school district during the deposition. The chancellor correctly overruled the objection at the time because a proper foundation could have been laid or the question could have been properly put at the deposition.

For the these reasons, I would affirm the final decree of the Court of Common Pleas of Philadelphia County.