## Kinderman v. PennDOT

*Peter G. Loftus,* for plaintiff.
*Jerome T. Foerster,* for defendant.

MUNLEY, *J.,* May 31, 1988 — This matter was heard by the court without a jury. Plaintiff, Edward G. Kinderman, has alleged he was the victim of employment discrimination, due to his non-job-related disability, by the Department of Transportation, Commonwealth of Pennsylvania.

A complaint in this action was filed on April 2, 1985. The basis of plaintiff's action was his involun-

tary demotion in job classification, on October 7, 1983, by defendant PennDOT. Plaintiff brings this action pursuant to the Pennsylvania Human Relations Act, 43 P.S. §951 et seq. Previously plaintiff had filed a complaint with the Human Relations Commission but that body failed to render a favorable decision and advised complainant of the availability of instituting the present proceedings. The subject litigation is properly before this court to determine whether defendant PennDOT engaged in discriminatory practices when it involuntarily demoted Mr. Kinderman.

## FINDINGS OF FACT

(1) Plaintiff was born on December 18, 1930.

(2) Kinderman was a 20-year veteran in the Marine Corps and served his country in both the Korean War and Vietnam War.

(3) During his duty with the Marine Corps, he worked approximately 17 years as a metalsmith foreman.

(4) While in the Marine Corps, plaintiff received training in the following areas: internal diesel crawler tractor repair maintenance; aircraft structural mechanic's shop practices; metalsmith foreman; engineer mechanics; vehicular body work; welding shop organization and management; heavy equipment mechanics; and accounting.

(5) In 1966, the Marine Corps determined plaintiff disabled due to bilateral loss of hearing resulting from nerve damage *caused by tanks, tank fire, artillery fire and similar military conditions. Kinderman saw combat in both the Korean War and Vietnam War.*

(6) Plaintiff retired from the Marine Corps with an honorable discharge on February 1, 1970 and pres-

ently receives 60-percent disability benefits for service-related medical problems.

(7) Plaintiff worked briefly for the Pennsylvania Gas & Water Company following his retirement from the Marine Corps.

(8) His duties for the Pennsylvania Gas & Water Company included inventory, logistics and supplies.

(9) He ended his employment with the Pennsylvania Gas & Water Company when he was offered a job by the Pennsylvania Department of Highways.

(10) Plaintiff was hired by defendant's predecessor, the Pennsylvania Department of Highways, on June 1, 1970.

(11) Plaintiff was hired as a preventive maintenance coordinator and was given the classification of a Mechanic I.

(12) When plaintiff initially learned of his classification as a Mechanic I, he informed Neil Chase, the county manager, and Bertram Perry, his immediate supervisor, of the physical limitations making it impossible for him to work as a Mechanic I. He also disclosed this information to Debbie Owens, the office secretary, and Jean O'Dell who worked in the office.

(13) Plaintiff was informed by Mr. Chase, the county manager, that he would be working as a preventive maintenance coordinator. In response to plaintiff's concern to being classified as a Mechanic I, Mr. Chase said, "Don't worry about that, you'll be working as a preventive maintenance coordinator."

(14) Plaintiff worked from the time he was hired in 1970 through 1983 as a preventive maintenance coordinator at the Clarks Summit facility. This is a Mechanic II position in a classification, a recognized higher category of employment and encompassing the work of a Mechanic I.

(15) Kinderman remained classified as a Mechanic I until October 7, 1983, when he was involuntarily demoted to highway maintenance worker which simultaneously reduced his salary from $689 biweekly to $520.50 biweekly.

(16) Plaintiff cannot work as a Mechanic I because of the bilateral hearing loss suffered in the military service. Furthermore, plaintiff suffers from diabetes and has had resulting cataract problems. In 1983 plaintiff was required to undergo cataract surgery on his left eye and this necessitates his wearing a contact lens. Noise present in the garage adversely affects his remaining hearing capacity and would lead to a total hearing loss. Dirt, dust and fumes present in the automotive garage irritate plaintiff's left eye rendering it impossible for him to work in a garage setting.

(17) Plaintiff's doctor, Anees Robert Fogley, M.D. has confirmed that plaintiff cannot work as an automotive mechanic in the garage setting. (See paragraph 50, *infra.*)

(18) Plaintiff has never performed as a Mechanic I since being hired on June 1, 1970 because of his physical disabilities. Despite the fact he was classified as Mechanic I, he performed the functions of a Mechanic II, i.e. preventive maintenance coordinator.

(19) The Clarks Summit garage of PennDOT did not have a preventive maintenance program prior to Mr. Kinderman's employment in 1970.

(20) Plaintiff set up the preventive maintenance program at Clarks Summit which involves the preventive maintenance in the shop for approximately 150 pieces of mobile equipment.

(21) Plaintiff performed the functions normally carried out by a procurement officer (Mechanic II-A): responsibility for filling out work orders and

forms necessary for the purchase of parts used in the day-to-day operations of an automotive garage.

(22) Kinderman also performed the functions normally carried out by a receiving agent (Mechanic II-B): responsibility for filling out work orders and documenting the maintenance history for Penn-DOT's equipment. (Exh. 36.)

(23) The evaluations of plaintiff make reference to his work in preventive maintenance, inventory, record keeping, and the care of equipment and supplies.

(24) Plaintiff was essentially performing as a Mechanic II but was paid at the lower classification of a Mechanic I. No effort was made by PennDOT to reclassify Kinderman at the higher level (Mechanic II) throughout the period of 1970 through 1983.

(25) Plaintiff's performance evaluation report for the period June 1977 through June 1978 indicated his overall evaluation to be excellent in all of the performance factors: quality of work; work habits; relationship with people; dependability; quantity of work; and initiative. (See plaintiff's exh. 8.)

(26) Plaintiff received an identical evaluation for the period June 1978 through June 1979. (See plaintiff's exh. 8-A.)

(27) Plaintiff's performance evaluation report for the period June 1979 through June 1980 contains the following comment by his evaluator: "Mr. Kinderman has a very thorough working knowledge of all aspects of department policy concerning maintenance equipment records and scheduling of equipment in the preventive maintenance program. He has organized the P.M. program for this activity and constantly monitors it to insure timely completion of each item. His efforts have been instrumental in the success of the program. His recording attendance is excellent." (See plaintiff's exh. 9.)

(28) Plaintiff's evaluation report for the period preceding his demotion, June 1982 through June 1983, reveals a *"very good"* overall evaluation with the following comment by the evaluator: "Mr. Kinderman has been under my management since November 1982 and has always worked to my complete satisfaction."

(29) In the early 1970s, the Clarks Summit garage foreman position, classified as a Mechanic II, became vacant. The work was divided between plaintiff and Nick Anuszewski, a fellow worker.

(30) Mr. Anuszewski was subsequently promoted to a Mechanic II position. Anuszewski was unfamiliar with the parameters of the position prior to his promotion. It was Kinderman who taught Anuszewski the Mechanic II work.

(31) Plaintiff's performance evaluation report for the period June 1979 through June 1980 makes reference to 60 percent of his job being Mechanic I duties. (See plaintiff's exh. 9.) This latter comment in exhibit 9 is a misrepresentation because Kinderman was unable to perform Mechanic I duties due to his physical disabilities. We find plaintiff's testimony credible when he states in the record (T.R. at 39-40) that he subsequently learned that the reference to Mechanic I duties was added to the performance evaluation report *after* he had signed the original report.

(32) The record establishes that Kinderman was not given a physical examination or a written job description at the time of his hiring.

(33) In April 1983, plaintiff was informed by Michael Czachor, county maintenance manager, that he was not performing the duties of Mechanic I. Mr. Czachor assumed his responsibilities at PennDOT Clarks Summit facility approximately 13 months prior.

(34) By letter dated April 25, 2983 (see plaintiff's exh. 21), plaintiff was informed by Czachor that the following alternatives were available to him:

"(1) Accept *training* as a mechanic and work on the floor in that capacity.

"(2) Accept a voluntary reduction to highway maintenance work at a reduction in pay.

"If *future* medical exams warrant a finding of *serious* medical problems, the following alternatives could be explored:

"(3) Involuntary reduction to highway maintenance work at *no* reduction in pay; or

"(4) Pursue disability retirement." (emphasis supplied)

(35) He was informed that if his medical condition precluded work as a Mechanic I, then there would be an involuntary reduction to highway maintenance at *no* reduction in pay.

(36) Plaintiff obtained documents from the Veteran's Administration which revealed that plaintiff was unable to perform inside the shop as a mechanic. The Veteran's Administration documents were turned over to Czachor.

(37) Czachor reviewed this documentation and then informed plaintiff that the evidence was inconclusive, and that plaintiff would have to go to another doctor.

(38) Plaintiff was examined by Dr. Fogley who determined that plaintiff could not perform as a mechanic in his letter of May 26, 1983.

(39) In response to Dr. Fogley's May 26, 1083 letter, Czachor then wrote to Kinderman on or about June 17, 1983 indicating that plaintiff could not work as mechanic or function as a highway maintenance worker.

(40) In the letter dated June 17, 1983, Czachor recommended disability retirement and suggested

that if the plaintiff failed or refused, he should then be dismissed.

(41) On July 14, 1983, Czachor wrote. Tom Collins, District Engineer for PennDOT, stating that *plaintiff did not "know how to do mechanical work."*

(42) The record before us clearly demonstrated that the plaintiff's extensive military training and background was mechanical and that he was unquestionably highly proficient in all types of mechanic's work. Furthermore, we find that the only reason for his limitation as to garage work was his disability.

(43) Based upon the representations by Czachor in his July 14, 1983 correspondence, Thomas Collins, PennDOT district engineer, wrote a letter on July 25, 1983, through personnel officer Gordon Weber, recommending an involuntary dismissal of plaintiff.

(44) Plaintiff was never given a copy of the July 25, 1983 letter.

(45) In the spring of 1983, plaintiff filed a reclassification grievance. Kinderman was advised by his union that PennDOT had agreed to reclassify him as Clerk II or highway maintenance position, *without* a loss in income or seniority, if he should file such a grievance. (This was an established policy according to other employees. See plaintiff's exhs. 30, 31.) Kinderman then pursued the grievance procedure.

(46) During the course of the grievance proceedings in 1983, plaintiff had an opportunity to review his personnel file. This opportunity to peruse the file produced a letter dated August 24, 1983, from Gordon Weber to Sharon Wright of the State Personnel Office, indicating that the District Office was going to furlough one Clerk II who was *identified as plaintiff, Edward Kinderman.*

(47) Kinderman was not a Clerk II at this point in time.

(48) Having discovered the above information, plaintiff refused to accept the proposed settlement, set forth in paragraph 45 above, during the course of the grievance procedure.

(49) When plaintiff discovered the August 24, 1983 letter (see paragraph 46 above), he filed a complaint with the Pennsylvania Human Relations Commission and thereupon terminated the grievance procedure. Plaintiff now believed if he accepted the proposed settlement, he would be furloughed.

(50) Gordon Weber, defendant's personnel analyst, testified that it was the plan of the Department of Transportation to wait until the grievance was settled and then furlough plaintiff. In this regard, plaintiff's exhibit 52, a September 27, 1983 memo between Mr. Collins and Ms. Wright, is illuminating. Weber further testified that the Clerk II position was not to be eliminated until April 2, 1984, but plaintiff was to be furloughed as soon as he was placed in the position. Furlough was defined by Thomas Collins as "laid off."

(51) Mr. Kinderman was informed by Sharon Wright of PennDOT's personnel department by letter of October 6, 1983 that he would be placed into the highway maintenance category by letter of October 6, 1983.

(52) In 1983 when Mr. Kinderman was demoted, PennDOT replaced him with two persons stationed at the Clarks Summit facility and brought two women in from the District Office at Dunmore to perform his work. The record demonstrates that each of these employees had equal or less training and experience as compared to Mr. Kinderman.

(53) The reduction to highway maintenance worker was involuntary and based only on Kinderman's disabilities and handicaps.

(54) Ms. Wright's letter incorrectly reflected that this demotion was voluntary.

(55) As a result of said demotion or reclassification, plaintiff's salary was reduced approximately $160.72 biweekly.

(56) Plaintiff had been in pay range 31, step H, earning $17,976 annually prior to his demotion.

(57) When demoted to highway maintenance worker, plaintiff was placed in pay range 24, step H, and received $13,575 per annum.

(58) A Mechanic II's pay range was approximately $19,750 per annum.[1]

(59) Despite the fact that Czachor's April 25, 1983 letter (see paragraph 34, above) indicated that an involuntary reduction to highway maintenance worker duties would result in *no* reduction of pay, plaintiff did suffer a reduction as outlined in paragraphs 57 and 58 above.

(60) On September 18, 1985 plaintiff received a letter from then District Engineer, Michael Ryan, advising him that all handicapped workers were to be furloughed.

(61) Approximately one month later, October 25, 1985, Kinderman received another letter from Mr. Ryan. This correspondence was sent through the Office of District Personnel Analyst - District Personnel Director, Gordon Weber, notifying plaintiff that he would be laterally reclassified from highway maintenance worker to a transportation equipment operator trainee effective November 1, 1985. The

---

1. Paragraphs 55, 56, 57 and 58 pertain to the 1983 pay scale; each of these figures would have to be adjusted to reflect earnings for 1984 through the present.

October 25, 1985 letter indicated that the highway maintenance position was to be abolished.

(62) Criteria for the reclassification was that Kinderman successfully pass a physical exam.

(63) As a result of this October 1985 action by PennDOT, Kinderman faced the option of becoming a transportation equipment operator trainee or being fired.

(64) Kinderman never became a transportation equipment operator trainee due to a stipulation of dismissal being entered in the United States District Court for the Eastern District of Pennsylvania.[2]

(65) From his demotion in 1983 to November 1985, plaintiff performed as a highway flagman, radioman, as well as working briefly at PennDOT's gas pumps, despite his disabilities.

(66) PennDOT attempted to place Kinderman in a Tech I or Tech II position which was under the civil service but would result in the loss of union seniority.

(67) Kinderman became suspicious that PennDOT was attempting once again to terminate him by perverse tactics.

(68) Plaintiff's skepticism of PennDOT heightened after he discovered that the defendant now categorized the Tech I position as a clerk's position. This represented the first offer to plaintiff since the filing of his complaint with the Human Relations Commission, a period of approximately three years.

(69) He questioned his immediate supervisors who were attempting to transfer him (Weber, Bombay, Baker, Finn) regarding the status of this position but received no response. William Baker, however, indicated that he felt Kinderman would lose his seniority.

2. *Hoage v. Thomas D. Larson,* Class Action/Civil Action no. 85-6072 (E.D. Pa.).

(70) Mark Kelly, the union representative, was also offered the same position but declined it for similar reasons.

(71) Prior to the trial in this matter, plaintiff was doing storage and inventory work although still classified as a highway maintenance worker.

(72) From October 10, 1983 through July 29, 1987, plaintiff was classified as a highway maintenance worker and classified as 24 H for payroll purposes. He earned approximately $13,575 per annum. (Adjusted, see footnote 1, *supra.*)

(73) From July 29, 1987 through the date of this opinion, plaintiff has been classified as a Store Clerk II. Kinderman is presently in the 26 H pay range earning $17,252 per annum.

## DISCUSSION AND CONCLUSIONS

By way of a preliminary matter, we must address the argument advanced by PennDOT that plaintiff's failure to reply to the new matter, constitutes an admission of the factual averments in said new matter. We concur with the argument advanced by plaintiff's counsel when he submits "there is no duty to reply when the new matter is in fact only a negative pleading, and denials of the averments of the complaint and conclusions of law." *Ritmanich v. Jonnel Enterprises Inc.,* 219 Pa. Super. 198, 208, 280 A.2d 570, 576 (1971). We construe these allegations as no more than mere defensive matters set up by way of defendant's answer; they do not rise to the level of new matter and therefore do not require a reply. See 6 Standard Pa. Practice 2d §30:3. Furthermore, the Pennsylvania Rules of Civil Procedure should be liberally construed, disregarding technical errors which do not affect the substantial rights of a party. Pa.R.C.P. 126. Considering the

mischief to be remedied, the object to be attained, as well as the nature of the statute we are following, suffice to say we are comfortable with our ruling.

Our next focus is the four-pronged attack on plaintiff's claim advanced by the Commonwealth. Defendant argues that plaintiff's claims are barred by the following: (1) Six-month statute of limitation pursuant to 42 Pa.C.S. §5522; (2) the sovereign immunity of defendant; (3) Article 39 of the master agreement between defendant and plaintiff's union, AFSCME, subjecting plaintiff's claims to arbitration and grievance; (4) res judicata or collateral estoppel serve as a bar to the plaintiff's claims as a result of the United States Middle District Court, February 12, 1985 opinion in *Kinderman v. Commonwealth of Pennsylvania, Department of Transportation,* no. 84-0800 (M.D. Pa., February 12, 1985).

On February 6, 1986, now President Judge James J. Walsh of this court issued an opinion and order which dismissed all of the claims of plaintiff herein except those brought pursuant to the Pennsylvania Human Relations Act, 43 P.S. §951 et seq. In deciding the four-pronged attack on plaintiff's cause of action, we are guided by and here adopt the able opinion of Judge Walsh. Specifically, each argument advanced by the Commonwealth today was dismissed by Judge Walsh. In dismissing the four arguments submitted by PennDOT in the February 6, 1986 opinion, our task is made that much clearer and permits us to set about addressing the discrimination action on its merits.

### Pennsylvania Human Relations Act

On April 2, 1985, plaintiff filed a complaint in our court alleging that PennDOT demoted him because of his handicap or disability, in violation of section

5(a) of the Pennsylvania Human Relations Act, 43 P.S. §955(a), which provides in pertinent part:

"§955. *Unlawful discriminatory practice*

"It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:

"(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required. . . ." 43 P.S. §955(a). Act of October 27, 1955, P.L. 744, §5, as amended, 43 P.S. §955 (Supp. 1965-1985).

In an employment discrimination case, the plaintiff bears the burden of establishing a prima facie case which, in the present matter, requires proof that Kinderman is disabled, that he was appointed to a position for which he was otherwise qualified, that he was demoted, and that PennDOT replaced him with someone with equal or lesser qualifications. See *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976). Once the prima facie case is established, the burden then shifts to the employer to establish the defendant was not the "best able and most competent" person to perform the required services, and that there was a legitimate nondiscriminatory reason

for the employment decision. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973). Thus, provided Kinderman has met his burden of establishing that he is disabled under the Pennsylvania Humans Relations Act, it becomes PennDOT's burden to establish that Kinderman's disability is job-related and, therefore, provides a valid basis for the demotion. *Amtrak v. Pennsylvania Human Relations Commission,* 70 Pa. Commw. 62, 452 A.2d 301 (1982), and *School District of Philadelphia v. Friedman,* 96 Pa. Commw. 267, 507 A.2d 882 (1986). Plaintiff may then still prevail by proving that the reasons offered by the employer were a pretext for the true motivational reasons behind PennDOT's decision. *Montour School District v. Human Relations Commission,* 109 Pa. Commw. 1, 530 A.2d 957 (1987), and *Orweco Frocks v. Human Relations Commission,* 113 Pa. Commw. 333, 537 A.2d 897 (1988).

Our analysis begins with the observation that there is no dispute between the parties that plaintiff is in fact disabled. A review of plaintiff's medical history, past and present, confirms this. The question now focuses on whether or not Kinderman's disability is job-related. Under section 4(p) of the act, a handicap or disability is by definition not job-related when it "does not substantially interfere with the ability to perform the essential functions of employment which the handicapped person applies for, is engaged in, or has been engaged in." 43 P.S. §954(p). The Pennsylvania Human Relations Commission Regulation 44.4, 16 Pa. Code §44.4, provides in pertinent part:

"Non-job-related handicap or disability—

"Includes the following:

"(i) Any handicap or disability which does not substantially interfere with the ability to perform the

essential functions of the employment which a hand-icapped person applies for, is engaged in, or has been engaged in. Uninsurability or increased cost of insurance under a group or employee insurance plan does not render a handicap or disability job-related.

"(ii) A handicap or disability is not job-related merely because the job may pose a threat of harm to the employee or applicant with the handicap or disability unless the threat is one of demonstrable and serious harm.

"(iii) A handicap or disability may be job-related if placing the handicapped or disabled employee or applicant in the job would pose a demonstrable threat to the health and safety of others."

In view of plaintiff's work history for 13 years with PennDOT and in light of defendant-employer's evaluations of the quality of his performance, this record clearly demonstrates that Mr. Kinderman's disability was non-job-related as that term is defined in section 4(p) of the act, *supra*. Moreover we find the high performance ratings given by the defendant-employer so conclusive that the discussion of any reasonable accommodation is unnecessary under the facts here present.

Plaintiff, Mr. Kinderman, has met his burden of establishing a prima facie case by a preponderance of the evidence. Complainant has established at the time of the challenged action that he belonged to a protected class, that he was qualified to perform the work of a preventive maintenance coordinator, that he was involuntarily demoted and suffered a reduction in salary, and that PennDOT replaced him with individuals with equal or less qualifications.

The centerpiece of the defense is set forth in a memo dated July 14, 1983, exhibit 22, wherein the plaintiff's immediate supervisor, Mr. Czachor, informed the district engineer, Mr. Collins, that Kin-

derman did not "know how to do mechanical work." From this point on it was all downhill for Mr. Kinderman. We find the evaluation expressed in the July 14, 1983 memo by the county maintenance manager to be incredible. The observations expressed therein flies in the face of Kinderman's 20 years of training, schooling and work experience with the Marine Corps, and his 13 years of outstanding evaluations for job performance, in the *same* position, with the *same* employer, and are totally unsupported by the record. Juxtaposed during cross-examination, Mr. Czachor, defendant's chief witness, testified that complainant was performing the normal work and carrying out the responsibilities of a Mechanic II. The defendant-employer submitted no additional evidence to sustain its qualification argument. Kinderman's testimony and evidence on the qualification charges were uncontradicted or more correctly stated, went unchallenged. Therefore it is our judgment that plaintiff was qualified to perform the work and duties required of the position which he held and his demotion on this basis is pretextual. *Orweco Frocks, supra.*

Secondly, we view PennDOT's district-wide policy argument (the policy designed to reduce the number of clerks or clerk filled positions on a one-per-county basis) as no more than a flawed defense to which we attach no weight. The policy argument simply fails to carry the day, i.e. adequately explain the Edward Kinderman matter. The district engineer testified that the basis for Penn-DOT's personnel policy was to get the most out of federal funds for road maintenance. That testimony may be considered enlightening and perhaps even laudable, but it is not relevant to our query: Why was Edward Kinderman singled out for the demotion? Based on a careful reading of the entire record,

Kinderman had an outstanding history with Penn-DOT and its predecessor, Pennsylvania Department of Highways. Defendant offered no evidence to indicate that Kinderman was ever *compared* with his fellow workers and found to be incapable of performing and therefore the logical one to be demoted to fulfill its policy. Contrariwise the record reflects contemporaneous with Kinderman's reclassification that PennDOT was required to engage the services of a number of employees to replace him. Furthermore, Kinderman's expertise as a preventive maintenance coordinator can be inferred from the fact that he was selected to train and show the replacements "exactly what had to be done. . ." (T.R. at 166.)[3] Our conclusion is further strengthened when one considers the fact that two of these four replacement personnel were garage foreman, classified as Mechanic IIs. This confirms that there was a continuing need for the same services and skills that Kinderman performed. In any event, after a close reading of the transcript it would appear that this district-wide policy issue was raised *after* the fact with the principle thrust of the defense being poor performance or lack of qualifications. The latter argument was dismissed, *supra,* as pretextual.

With respect to defendant's evidence concerning the overall reduction of PennDOT personnel in the Commonwealth between 1970 and 1986 (1986 being three years after Kinderman's problem) from 22,000 to 12,680, we find this to be equally unpersuasive. We respectfully reject the inference that reduction of the Commonwealth's cadre of employees, in general, is somehow relevant or controlling in the actions taken by PennDOT against Mr. Kinderman.

---

3. In light of this evidence we think it unnecessary to address the issue of "best able and most competent" person to perform the required services.

This record reveals that in 1970 plaintiff was placed in PennDOT's Clarks Summit garage in the position of a preventive maintenance coordinator. He was classified for payroll purposes as a Mechanic I but was effectively performing out of class as a Preventive Maintenance Coordinator, a position normally classified as a Mechanic II. This classification continued throughout his 13 years of employment with PennDOT. The record demonstrates that certainly PennDOT benefited throughout these 13 years from plaintiff's labors, in that in return for the accommodation they made for the employee (no garage duty) they not only obtained his expertise but profited by paying him in the lower pay scale (Mechanic I). At the time of Kinderman's initial hiring by PennDOT and his learning of his classification as a Mechanic I, plaintiff immediately informed his superiors that he was unable to perform on the floor of the garage as a Mechanic I due to his physical handicaps. This information was forthrightly brought to defendant's attention by Mr. Kinderman. His service-connected disability and resulting physical limitations were well documented, i.e., his medical discharge from the United States military, documentation from the Veterans Administration concerning that disability, and later reaffirmation by Dr. Fogley's examination and reports. Kinderman was never given any pre-employment examination per defendant's standard operating procedures at the time of his hiring. In light of all these circumstances he was *assured* by PennDOT supervisors that he would not be required to perform mechanical work in the shop. Instead, PennDOT and its officials confirmed that he would be in charge of the preventive maintenance coordination for the PennDOT equipment at the Clarks Summit facility, which involved the overall admin-

istration and supervision of some 150 pieces of mobile equipment. The testimony proffered and exhibits introduced demonstrate that plaintiff faithfully conducted his work and implemented the preventive maintenance program for PennDOT throughout this period, from 1970 through 1983. The record is devoid of *any* reference to negative performance evaluations or complaints concerning his work throughout the entire period he was so engaged by PennDOT, and in fact reflects, to the contrary, that he performed and contributed in an exemplary fashion. The record is clear that defendant-employer in attempting to rebut the prima facie case never attempted to reconcile these inconsistencies.

Furthermore this record fails to establish that any official at the Clarks Summit facility ever reviewed Kinderman's previous performance evaluations prior to judging him unqualified. This faulty circumstance is compounded when one considers the fact that neither did any official in the District Office or anyone throughout the entire PennDOT system examine these credible documents which evidence Kinderman's outstanding performance for 13 years before judging him. The record is likewise bereft of evidence of any comparisons for demotion purposes between Kinderman and fellow employees stationed at the Clarks Summit facility. These procedures we find constitute questionable selection practices by the defendant-employer. *Orweco Frocks, supra.*

The Pennsylvania Supreme Court recently stated that "it is appropriate to the remedial purpose of the [Pennsylvania Human Relations] Act that the prima facie case not be an onerous one." *Allegheny Housing Rehabilitation Corp. v. The Human Relation Commission,* 516 Pa. 124, 532 A.2d 315 (1987). Guided by this principle, we find that the evidence

as a whole demonstrates that plaintiff has sustained his burden of establishing a prima facie case of intentional discrimination. PennDOT, the defendant-employer, has been unable to demonstrate that there was a legitimate non-discriminatory reason for its employment decision to involuntarily demote Mr. Kinderman with a substantial reduction in his wages. Defendant in rebutting the prima facie case attempted to show a valid basis for the demotion; we find its defense, the lack of qualification or poor performance, to be *pretextual* and its policy argument uncorroborated by the record and raised after the fact. We are convinced, based on a careful reading of this record, that the true motive for the actions taken by PennDOT and its officials was discrimination based on Mr. Kinderman's disability. We further find that Edward Kinderman is qualified for and physically able to perform the duties of a preventive maintenance coordinator.

## DAMAGES

These proceedings record PennDOT officials dashing to a judgment that was predetermined and fixed, whose approach was not straightforward, and whose practices, on occasion, can only be characterized as deceptive. We found Edward Kinderman to be an appealing figure who despite his handicap worked ably and loyally for his employer through the years. Unfortunately we cannot find that PennDOT reciprocated in a like fashion.

In view of the fact that PennDOT is one of the largest employers in the Commonwealth of Pennsylvania I am seriously disturbed that it is in this instance guilty of discrimination. One would hope that the Kinderman matter is an isolated case. However the laws that prohibit employment dis-

crimination in this state and in this nation must be observed in *every* instance. Discrimination in all its varied forms is abhorrent in our democracy. Discrimination wherever and however it takes place (race, age, sex, handicap, etc.; in the work place, in the school, etc.) will not be tolerated. It is incumbent on PennDOT to scrupulously observe anti-discriminatory policies in its organizational structure from top to bottom. A state agency such as PennDOT should set the example for fair and equal employment practices and like a beacon light serve to encourage other institutions to follow its example as a exemplary employer.

It is our opinion the act's prohibition against discrimination on the basis of non-job related disability has been violated by the defendant-employer and we will order that PennDOT cease its discriminatory practices towards plaintiff Edward Kinderman; and that defendant PennDOT will be ordered to pay Edward Kinderman his lost wages, totaling $16,000 (this sum should represent and include lost wages suffered to the present time), representing the difference between the pay scale of plaintiff as a Mechanic I and the lessor amounts paid to him as a result of his demotion[4] plus 6 percent interest; and that Mr. Kinderman should be reinstated to the status of a Mechanic I retroactive to the time of his demotion by PennDOT (October 6, 1983), for purposes of lost wages and this should include all other employment rights and benefits including retirement, seniority, etc. In light of the substantial time that has elapsed and based on all of the evidence, we find it equitable that the defendant-employer pro-

---

4. We are unable to arrive at a sum certain because of the normal escalation in defendant-employer's pay scales. A sum certain can be arrived at by adjustment, within the parameters we have set out.

mote Mr. Kinderman to the status of a Mechanic II and therefore PennDOT upon payment of said lost wages is directed to *immediately* advance Mr. Kinderman to the status of a Mechanic II for payroll and occupational purposes; and that further PennDOT should be responsible for the payment of all reasonable legal costs and expenses incurred by the complainant.

An appropriate order will be entered.

## ORDER

Now, May 31, 1988, having determined that PennDOT, defendant-employer, violated the provisions of section 5(a) of the Pennsylvania Human Relations Act, 43 P.S. §955(a), for the reasons set forth above, it is hereby ordered that judgment be entered in favor of the plaintiff-employee, Edward Kinderman and against defendant-employer, PennDOT; and further, it is ordered:

(1) That defendant-employer, PennDOT, cease and desist from engaging in discriminatory acts and practices against the said plaintiff-employee, Edward Kinderman, on the basis of his non-job related disabilities and;

(2) That defendant-employer, PennDOT, pay to plaintiff-employee, Edward Kinderman, $16,000 in lost wages plus 6 percent interest and;

(3) That defendant-employer, PennDOT, immediately promote plaintiff-employee, Edward Kinderman, to the classification of Mechanic II, for payroll and occupational purposes and;

(4) That defendant-employer, PennDOT, is ordered to pay plaintiff-employee, Edward Kinderman, all reasonable attorney fees and costs that plaintiff incurred as the result of this litigation. Plaintiff's counsel is directed to prepare and submit

to this court, for our consideration, a bill of costs, concerning the same.